Timothy O. TEMPLE, Petitioner,

v.

DISTRICT OF COLUMBIA RENTAL
HOUSING COMMISSION,
Respondent,

Eric D. Kirkendall and George
Lobsenz, Intervenors.

Nos. 85–1119, 85–1129 and 85–1247.

District of Columbia Court of Appeals.

Argued Sept. 11, 1986.
Decided Dec. 1, 1987.[*]

[*] This opinion was released in typed form prior to printing.

Eric Von Salzen, with whom Richard T. Rossier, Washington, D.C., was on the brief, for petitioner.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom John H. Suda, Acting Corp. Counsel at the time the briefs were filed, and Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the briefs, for respondent.

Richard C. Eisen, Washington, D.C., for intervenors.

Gerald F. Ivey, Washington, D.C., filed a statement in lieu of brief, for amicus curiae, Metropolitan Washington Planning and Housing Ass'n.

Roger D. Luchs, Washington, D.C., filed a brief, for amicus curiae Apartment and Office Building Ass'n of Metropolitan Washington, Inc.

Before MACK and BELSON, Associate Judges, and NEBEKER,[1] Associate Judge, Retired.

1. Judge Nebeker was an Associate Judge of this court at the time of argument. His status changed to Associate Judge, Retired, on September 1, 1987.

**1026** 

MACK, Associate Judge:

In these consolidated petitions, landlord Timothy Temple seeks review of two decisions of the Rental Housing Commission ("RHC") penalizing him for failure to register his housing accommodation. The decisions resulted from separate tenant petitions filed by tenant-intervenors Kirkendall and Lobsenz. In the Kirkendall decision, the RHC ordered Temple to refund to Kirkendall trebled rent overcharges for the period between Septmeber 1, 1982, and July 31, 1983. The RHC also awarded attorneys' fees. In the Lobsenz decision, the RHC ordered Temple to refund to Lobsenz trebled rent overcharges for the period between February 1, 1983, and November 30, 1984. The RHC also ordered refunds of trebled rent overcharges to the three other tenants who lived in Temple's apartment house but did not officially join Lobsenz' tenant petition.

Temple alleges that the RHC committed numerous errors in both its determination that he violated the Rental Housing Act of 1980 and its computation of the appropriate penalties. Consistent with this opinion, we affirm in part, reverse in part, and remand for further proceedings.

## I.

The protracted dispute in this case arises over Temple's ownership of a five-unit apartment building located at 216 Third St. S.E., Washington, D.C. (hereinafter "the building"). The building is a three-story rowhouse located in an R-4 zoning district. A description of events prior to the commencement of these actions provides the necessary foundation for an understanding of Temple's primary claim.

### A.

#### Prior Events

In 1951, Kemper Simpson, the former owner of the building, was issued a Certificate of Occupancy permitting the rental of "all" units in the building. The Certificate did not specify the number of units contained therein, but the issuance of the Certificate for an "apartment building" indi-cated the District's approval of a nonconforming use in the R-4 zone. In 1962, Simpson applied for a new Certificate of Occupancy, requesting use of the building as a two-family flat. Use of the building as a two-family flat would restore the building to a conforming use within the zone. In 1963, Temple, allegedly without knowledge of the 1962 application by Simpson, purchased the building. Temple asserts that at the time of his purchase, five units in the building were rentals and his purchase was based on that use.

Although Temple was required to secure a new Certificate of Occupancy upon his purchase and use of the property as rentals, 20 DCRR § 8104.1 (1973) (Zoning Regulations) (effective May 12, 1958), he did not do so. Consequently, the District, unaware of Temple's purchase of the building, issued a new Certificate of Occupancy to Simpson in 1964, limiting the use of the building to a two-family flat as per Simpson's 1962 request. Temple asserts that he had no knowledge of the 1964 Certificate of Occupancy.

In 1968, however, Temple applied for and received a Certificate of Occupancy for a two-family flat. In 1970, he sought a variance from the Board of Zoning Adjustment ("BZA") for use of the property as a five-unit apartment building. The variance was contested by the Capitol Hill Restoration Society, and, after lengthly proceedings, the BZA granted a variance for the rental of three, not five, units. Temple never subsequently applied for a Certificate of Occupancy reflecting the permitted variance. Consequently, the 1968 Certificate of Occupancy, permitting two flats, was in effect when rent control first commenced in the District.

Despite the 1964 and 1968 limitation of the use of the property as two flats, Temple at all times operated five units out of his building. At no time between 1971 and 1983 did Temple attempt to seek another variance for operation of a five-unit building. Moreover, throughout the entire time, Temple operated his building without the required housing business license. D.C. Code § 47–2828 (1981) (District may re-

quire licenses for buildings other than single-family houses, two-family houses, or rooming houses with fewer than four roomers); 14 DCMR § 200.3 (1986) (no person shall operate a housing business without a housing business license). Finally, at no time between the inception of rent control and 1983, did Temple attempt to register his building with the Rental Accommodations and Conversion Division ("RACD") of the Department of Consumer and Regulatory Affairs.[2]

## B.

### The Kirkendall Decision

On September 1, 1982, tenant Eric Kirkendall and his wife moved into one of the units in the building under a one year lease of $510 per month. Relations between Temple and Kirkendall deteriorated almost immediately. On January 4, 1983, Kirkendall filed a tenant complaint alleging, in pertinent part, that Temple never registered the building, that he operated a five-unit apartment house when the Certificate of Occupancy authorized only a two-family flat, and that he never obtained a housing business license.[3] Kirkendall sought, among other forms of relief, the establishment of the appropriate rent ceiling and a trebled rent refund.

On January 12, 1983, after more than eight years of rent control laws, Temple made his first trip to the RACD to inquire about registration. The RACD informed Temple that he could not register his building until he obtained a Certificate of Occu-

pancy reflecting the building's valid use as a five-unit apartment house.

During the ensuing months, Temple pursued with the BZA a variance from the two-family flat status of his building. In a decision dated July 6, 1983, the BZA granted Temple's application. On July 25, 1983, Temple brought to the RACD the minutes from the BZA meeting which confirmed the BZA's approval of Temple's application for a variance for use of the building as a five-unit apartment house. Temple was issued a temporary registration number at that time.

On September 19, 1983, a hearing on Kirkendall's petitions was held.[4] In a decision dated October 18, 1983 (hereinafter the "Underdue decision"), hearing examiner Betty Underdue determined in pertinent part that the building was not properly registered and that the correct rent ceiling for Kirkendall's unit was $200. Underdue ordered Temple to properly register the property, established a rent ceiling of $200, and ordered a single refund of all rent Temple charged Kirkendall in excess of the $200 ceiling. An administrative appeal followed.

Pursuant to that appeal, the RHC held a hearing on February 16, 1984. According to record evidence, both before and after the hearing, Temple engaged in several conversations with the RACD in which he attempted to determine how he could establish and adjust the rent ceilings of all the units in his building pending his appeal of the Underdue decision. The Rent Adminis-

---

2. The Rental Accommodations and Conversion Division ("RACD") of the Department of Consumer and Regulatory Affairs was formerly called the Rental Accommodations Office ("RAO"). The RAO was abolished pursuant to Reorganization Plan No. 1 of 1983. 30 D.C.Reg. 374, 378 (1983). Throughout this opinion, the first-level administrative agency responsible for the enforcement of the rental housing laws will be referred to as the RACD, despite the fact that some of the events described herein occurred prior to the abolition of the RAO.

3. Kirkendall also alleged that Temple demanded a security deposit of one and one-half times one month's rent in violation of the law. Security Deposit Act, D.C. Law 1–48, § 3(b), 1976 D.C. Stat. 13. Temple conceded this violation.

Kirkendall further alleged that Temple had substantially reduced the services and facilities of Kirkendall's unit. This claim was subsequently rejected by the RACD and forms no part of this appeal.

4. A hearing was originally held in February 1983, and a decision favorable to Kirkendall was rendered on March 10, 1983. Since Temple was not present at the hearing, he sought relief from the decision. The RACD ultimately determined that Temple had given a substantial reason for his absence and authorized a hearing de novo on Kirkendall's petition. This de novo hearing took place on September 19, 1983. Prior to the de novo hearing, Kirkendall filed a second petition largely specifying in greater detail the charges against Temple.

trator of the RACD apparently informed Temple that the rent ceilings on his other four units could not be established nor could adjustments on all five units be made until the RHC rendered its decision. The Rent Administrator indicated that the outcome of the appeal would establish the rent ceilings for the other four units in the building.

On August 3, 1984, the RHC affirmed the Underdue decision but remanded the case for a determination of whether the RACD should have trebled the rent refund and awarded attorneys' fees to Kirkendall. By a decision dated November 18, 1984 (hereinafter the "Blaher I decision"), hearing examiner Michael Blaher trebled the damage award—due to Temple's "unclean hands"—and ordered payment of reasonable attorney's fees. The RHC affirmed the Blaher I decision on July 18, 1985, and this petition for review followed.

## C.

### *The Lobsenz Decision*

On February 1, 1983, shortly after Kirkendall filed his first tenant petition, George Lobsenz moved into one of the units in Temple's building for a rent of $665 per month. Approximately one year later, on January 16, 1984, Lobsenz filed a tenant petition alleging that no rent ceiling had been established for his unit, and that consequently, his rent was in excess of the maximum allowable. Temple thereafter requested a stay in the Lobsenz' proceedings pending the RHC's decision in the Kirkendall case. After the August 1984 RHC decision in the Kirkendall case, a hearing was ultimately scheduled on Lobsenz' petition for October 29, 1985.

Prior to the hearing, Temple filed a "voluntary agreement" in which he attempted to set the rent ceilings by agreement of 70% of the tenants in the building. D.C. Code § 45–1526 (1981). Additionally, prior to the hearing, another tenant in the building, Kathleen Michels, wrote a letter to the RACD requesting that the Lobsenz' proceedings be broadened to include all ten-

ants in the building. She also indicated that she had signed the voluntary agreement only after explicitly reserving her right to invalidate her consent.

Hearing examiner Blaher presided over the October 29, 1984, hearing. By order dated October 31, 1984, Blaher assumed jurisdiction to determine the appropriate rent ceilings for all the units in the building and to assess the validity of the 70% voluntary agreement. The continued hearing concluded on November 15, 1984.

By decision dated January 22, 1985 (hereinafter the "Blaher II decision"), Blaher found that Temple had not properly registered his building until July 25, 1983.[5] Due to Temple's failure to register, the base rents applicable in July 1983 were the rents in effect in February 1973. Furthermore, since Temple did not file any certificates of implementation for rent increases or vacancy increases after he registered, the base rents constituted the current rent ceilings. The hearing examiner then computed the rent refunds due each of the four tenants in the building and trebled those refunds, finding that no "exceptional circumstances" justified a single award. Finally, Blaher disapproved the 70% voluntary agreement after determining that the form the tenants signed was invalid since it did not accurately state the true rent ceilings of the units.

Temple appealed this decision. On July 18, 1985, the RHC affirmed, and this petition for review followed.

## II. VIOLATION OF THE ACT

Temple first argues that the RHC is estopped from penalizing him for failure to register, and that, alternatively, the date of his effective registration should have been January 12, 1983, rather than July 25, 1983. We address these contentions in turn.

## A.

### *Excuse from the Registration Requirement*

The Rental Housing Act of 1980 was in effect when the tenant petitions were filed

---

**5.** In the decision, Blaher stated that the date of registration was July 23, 1983. The record evidence upon which he based his determination, however, irrefutably showed that the correct date was July 25, 1983. Therefore, we will use the date of July 25, 1983.

in this action.[6] D.C. Law 3–131, 28 D.C. Reg. 326 (1981) (codified at D.C.Code §§ 45–1501 to –1597 (1981)). Every rental housing act since 1975, including the 1980 Act, has required nonexempt landlords to register their housing accommodations with the RACD in order to implement rent increases. D.C.Code § 45–1519(a)(1)(B) (1981) (1980 Act).[7] Furthermore, every rental housing act since 1975 has required that the registration forms be accompanied by the Certificate of Occupancy applicable to the building. *Id.* § 45–1516 (d)(1)–(2).[8] Pursuant to such a mandate, the RHC rejects and invalidates registration forms which are not accompanied by valid Certificates of Occupancy unless the failure to obtain the Certificate of Occupancy is attributable to the government's failure to act or to the government's delay in issuing the license. *1447 Chapin Street Tenants Association v. Meridian Management,* T/P No. 10,107 at 2 (RHC November 30, 1983) ("[t]he Commission differentiates between cases where a license is not issued because of housing code violations as distinguished from instances where the city failed to issue such documents in a timely fashion"); *see Binder v. Heiligh,* T/P No. 11,427 at 2 (RHC February 7, 1985) ("[w]here a landlord has taken reasonable steps to secure necessary licenses, to register the property and is in fact in compliance with housing code regulations, the landlord should not be penalized for delays caused by or attributable to the government"); *Dismer Auxier Co. v. Brown,* T/P No. 10,090 (RHC October 24, 1983).

Temple does not dispute the agency's finding that he "never registered, or even attempted to register" until 1983. He argues, however, that his failure to comply with the registration requirement is excused because the negligence of the District of Columbia Department of Licenses and Inspections prevented him from securing the requisite Certificate of Occupancy.

Only a review of the voluminous record in this case gives one an appreciation of the degree to which Temple unabashedly blames the District of Columbia for his current predicament. Individually and through representatives, in letters, motions, memoranda, briefs, and testimony, Temple asserts that his serious violations of the zoning and rental housing laws of the District were occasioned entirely by the District's loss of Kemper Simpson's 1951 Certificate of Occupancy which demonstrated Temple's historic right to use his building as a "non-conforming" five-unit apartment house. Unfortunately for Temple, the factual predicates of his cries of innocence do not withstand scrutiny.

First, the 1951 Certificate of Occupance no where indicates that the building contained five rental units. It merely authorizes the rental of "all" units in the building. Second, Temple himself abandoned whatever possible historic right he had to operate his building as an apartment house which did not conform to R–4 zoning requirements when, in 1968, he applied for and received a Certificate of Occupancy for a two-family flat. 20 DCRR § 7104.3 (1973) (Zoning Regulations) (effective May 12, 1958) ("[w]hen an existing *nonconforming use* has been changed to a conforming or more restrictive use, it shall not be changed back to a *nonconforming use* or less restrictive use") (emphasis in original). Furthermore, to the extent there is any truth in Temple's assertion that he applied for a two-family Certificate of Occupancy in 1968 only because the District informed him that the 1964 Certificate of Occupancy issued to Simpson circumscribed Temple's right, Temple's own unlawful failure to secure a Certificate of

---

6. Because the 1980 Act controls the disputes in this case, the citations in this opinion will be drawn from that Act. The 1980 Act was superseded by the Rental Housing Act of 1985 on July 17, 1985. D.C. Law 6–10, 32 D.C.Reg. 3089 (1985) (codified at D.C.Code §§ 45–2501 to –2594 (1986 Supp.)).

7. D.C.Code § 45–1644(e)(2) (1977 Supp.) (1975 Act); *id.* § 45–1689(a)(1)(B) (1979 Supp.) (1977 Act); *id.* § 45–2518(a)(1)(B) (1986 Supp.) (1985 Act).

8. D.C.Code § 45–1642(b)(1)–(2) (1977 Supp.) (1975 Act); *id.* § 45–1686(d)(1)–(2) (1979 Supp.) (1977 Act); *id.* § 45–2515(f)(1)–(2) (1986 Supp.) (1985 Act).

Occupancy for over five years after his purchase of the building resulted in the issuance of the 1964 Certificate of Occupancy in the first place.[9]

In any case, even if the 1951 Certificate of Occupancy bolsters Temple's claim of a right to use the building as a five-unit apartment house, the 1951 Certificate of Occupancy was never lost by the District of Columbia. Indeed, it formed an integral part of the record of the 1970 BZA proceedings when the BZA heard and rejected Temple's request for a variance from the two-family flat occupancy Temple had applied for just two years earlier.

Moreover, the results of the 1970 variance proceedings can in no way be characterized as a mistake or omission on the part of the District. A full and fair hearing was conducted on Temple's contested application. After the denial of the application for the rental of five units, Temple filed a request for reconsideration. Subsequent to yet another hearing, the BZA again denied the variance. Temple never appealed that result. During the ensuing thirteen years, Temple operated his building as a five-unit apartment house despite a Certificate of Occupancy authorizing only a two-family flat.[10]

Moreover, even if there were merit to Temple's meritless argument that government error prevented him from obtaining a Certificate of Occupancy for a five-unit apartment house, Temple was still obligated to present himself for registration with the RACD when rent control first became effective. As the RHC held: "This landlord did not attempt to register." The agency then distinguished Temple's predicament from the cases in which government delay or failure to act results in a landlord's inability to secure a valid Certificate of Occupancy. See Binder, supra.

Because we find no government error in Temple's failure to obtain a Certificate of Occupancy for a five-unit apartment house prior to 1983, and because, even if we did, Temple's failure to appear at the RACD for over eight years after the start of rent control would still be unjustified, his argument that the RHC is estopped from imposing damages on him for failure to register is utterly meritless.

### B.

### Constructive Registration

The RHC found that Temple registered his property on July 25, 1983. On that date, Temple spoke to Michael Scott, the Chief of Client Services of the RACD, and showed him the minutes of the July 6, 1983 BZA meeting during which Temple's request for a variance had been granted. Scott issued Temple a registration number which was temporary until such time as Temple both obtained a final Certificate of

---

**9.** Temple's 1968 application for a two-family flat Certificate of Occupancy is barren of any indication of Temple's interest in securing a Certificate for a five-unit apartment house. Indeed, on the typed application form, Temple stated that the building was previously used as a "private residence." Furthermore, in 1968, the former owner was still alive and thus could have verified the building's historic use as a five-unit apartment house were Temple interested in securing a variance for such use at that time.

The District presented the following possible explanation for Temple's 1968 request for a two-family flat Certificate of Occupancy:

It may be that both Mr. Simpson's and Mr. Temple's applications for two-flat certificates were related to the District's 1961 Building Code, which had imposed new fire safety requirements on all buildings with more than *two* living units. See Building Code (1961) Arts. 8A, 8C and Table 100. In 1970, Mr. Temple testified before the BZA that, if given a variance, "in restoring the building to its original use, I would in effect be adding * * * the required fireproofing." S[upplemental] R[ecord] 6; see also S.R. 26 ("I'm putting fireproofing in the basement").

District's brief at 7 n. 9 (emphasis in original).

**10.** Temple argues that the BZA's 1983 approval of his requested variance vindicates his claim that for almost twenty years the District erred in denying him the Certificate of Occupancy to which he was allegedly entitled. Our reading of the July 6, 1983 decision of the BZA, however, leads us to a different conclusion. It appears that the BZA partially based its decision to grant the variance on the fact that the requested variance would be compatible with current uses in the immediate area. To the extent the BZA based its decision on Temple's claim of a historic right to the nonconforming use, suffice it to say that the record before the BZA in its non-adversial proceedings was not as complete as is our record in this appeal.

Occupancy and a housing business license and paid the required fees for registration.

Temple argues, however, that he should be deemed "constructively registered" on January 12, 1983, the date he first spoke to an employee of the RACD and was informed that he would be unable to register until he secured a Certificate of Occupancy for a five-unit apartment house. He claims that since government error prevented him from obtaining the Certificate sooner, his attempt to register should be deemed effective that day.

 To the extent this argument overlaps with Temple's claim of estoppel, we reject it for all the reasons stated above. In this case, the application of principles of equity back to the time of January 1983 would require a good deal less evidence of Temple's intention to circumvent rent control than appears on this record. *See Udall v. Littell*, 125 U.S.App.D.C. 89, 96, 366 F.2d 668, 675 (1966), *cert. denied*, 385 U.S. 1007, 87 S.Ct. 713, 17 L.Ed.2d 545 (1967) ("[i]t is elementary, of course, that one seeking equity must do equity and must show 'clean hands' at the threshold").

Moreover, the agency applied equitable principles in deeming Temple registered as of July 25, 1983. At that time, Temple had no Certificate of Occupancy, no housing business license, and had paid no registration fee. In fact, a Certificate of Occupancy was not issued to Temple until December 28, 1983, and a housing business license was not issued until December 1, 1983. The agency's decision to deem Temple registered as of July 25, 1983, comported with the sensitivity it exhibits toward delays in the actual issuance of licenses and permits. *See Binder, supra.* The agency, however, is not and should not be required to "constructively register" a housing accommodation when the agency has no proof of the legality of the use of the property.[11] *See* D.C.Code § 45–1516(d)(1)–(2) (1981) (requiring registration forms to contain certifi-

cates of occupancy and dates and numbers of housing business licenses).

### III. DAMAGES

Temple alleges that errors were committed in all phases of the damage computation. We address these in turn.

#### A.

##### *Computation of base rent*

Under the 1980 Act, the term "base rent" is defined as:

> [T]he sum of rent charged on February 1, 1973, and all rent increases authorized for that rental unit by prior rent control laws....

*Id.* § 45–1503(2). No increases above a "base rent" are permitted unless a building is properly registered with the RACD. *Id.* § 45–1519(a)(1)(B); *see* note 7, *supra.* Since Temple did not register with the RACD until July 25, 1983, the agency determined that the base rent of his units as of July 25, 1983, was the rent he charged on February 1, 1973.

##### 1.

##### *Year from which the base rent levels were drawn*

Temple first argues that the use of 1973 as the relevant year in determining the base rent was erroneous. He contends that his occupancy of one of the units in the five-unit building exempted the building from registration until 1977 when he moved out. *Id.* § 45–1516(a)(3) (exempting any rental unit in any housing accommodation of four or fewer units.) Thus, the "base rent" figure used in the damage computation should have been drawn from 1977 rent levels.

In its final decisions of July 18, 1985, the agency rejected this contention on the merits. It determined that Temple's ownership of five rental units rendered him ineligible for the small landlord exemption regardless of his occupancy of one of the units.

---

11. It should also be noted that during Temple's conversation with the RACD on January 12, 1983, he never mentioned the address of his building nor did he take even minimal steps toward filing a registration statement. Perhaps this partially explains the RHC's characterization of the January encounter as "nothing more than a passing conversation."

■ This court has had occasion to address the small landlord exemption. *Revithes v. District of Columbia Rental Housing Commission*, 536 A.2d 1007 (D.C. 1987). We stated: "[t]here is no question that a unit occupied by an owner is not 'rented or offered for rent' and thus cannot be included in the aggregate number of units under the control of an owner for so long as the owner occupies the unit." At 1017, n. 25 (citing the definition of "rental unit" at D.C.Code § 45–1681(w) (1979 Supp.)). Since, in Temple's case, the agency invalidated Temple's claim of exemption based solely on its erroneous interpretation of the small landlord exemption, the ruling was wrong as a matter of law.

The District and intervenors argue, however, that several other grounds support the agency's determination not to grant Temple an exemption. First, they argue that under the 1975 Act as originally passed, only a rental unit rented by the occupant of a housing accommodation of not more than two rental units was exempt. D.C.Code § 45–1642(a)(5) (1976 Supp.). Since Temple's building contained more than two rental units, they argue that Temple was not exempt under the 1975 Act as originally enacted and thus cannot claim an exemption now.[12]

Second, they rely on Temple's failure to file a Claim of Exemption Statement. D.C. Code § 45–1516(a)(3) (1981); Act of November 10, 1976, D.C. Act 1–173, § 2(e), 23 D.C.Reg. 3608, 3611) (landlords were first required to file a Claim of Exemption Statement under this emergency act). Third, they argue that even if the "four or fewer units" cut-off point is applied retroactively to Temple's claim, and even if Temple's failure to file a Claim of Exemption Statement in 1976 does not thereby render him subject to the Rent Stabilization Program

at that time, Temple still failed to prove by credible evidence that he occupied one of the units in the building during the relevant period.[13] Finally, they argue that evidence of Temple's ownership of more than his property at 216 Third St., S.E., defeats his claim on the merits.

The agency, however, did not rely on these numerous grounds in rejecting Temple's claim of exemption. It never addressed the applicability of the 1975 Act as originally enacted nor did it review the evidence to determine whether, on the merits, Temple was still not exempt. Furthermore, in only one of its decisions did it allude to Temple's failure to file a Claim of Exemption Statement: "Landlord filed no claim of exemption nor took any steps to perfect his entitlement. *Even assuming that the agency was not enforcing this provision of the Act,* the landlord's appeal must still fail [because an owner-occupied unit is counted in determining aggregate number]." RHC Decision of August 4, 1984 (emphasis added). Given the ambiguity of such a statement, Temple's failure to file a Claim of Exemption Statement can hardly be characterized as a ground of the agency's decision not to grant him an exemption. Indeed, it is clear to this court that the agency's decision was based solely on its erroneous determination that an owner-occupied unit is to be counted in determining the aggregate number of units for purposes of the small landlord exemption.

■ Under the circumstances of this case, we decline to rely on grounds not relied upon by the agency in making its determination. *Jones v. District of Columbia Department of Employment Services*, 519 A.2d 704, 709 (D.C.1987) ("[a]n administrative order can only be sustained on the ground relied on by the agency"). In light of the complexity involved in the questions of whether the original 1975

---

12. By emergency legislation of August 12, 1976, the Council eliminated the occupancy requirement and exempted from coverage those rental units in a housing accommodation of not more than 4 units, all interest in which was owned by not more than 4 natural persons none of whom had any direct or indirect financial interest in any other rental unit or housing accommodation. Act of August 12, 1976, D.C. Act 1–148,

§ 2(5), 23 D.C.Reg. 1673, 1675 (1976) (codified at D.C. Code § 45–1642(a)(3) (1978 Supp.)).

13. Indeed, Temple's testimony in this regard can fairly be described as evasive: "I moved out ... somewhere around 1976 or 1977. I used '77 as the base year [for calculating rents]. But this is conjecture."

small landlord exemption has any applicability to a petition filed under the 1980 Act, and whether, pursuant to a petition filed under the 1980 Act, a landlord should be procedurally disqualified from exemption because he failed to file a Claim of Exemption Statement in 1976, the agency must, in the first instance, rely on those grounds to support its decision.

We, therefore, remand this case for the taking of further evidence on Temple's claim of exemption prior to 1977. Of course, the burden is on Temple to prove by credible, reliable evidence his entitlement to exemption, *Bernstein v. Lime*, 91 A.2d 841, 843 (D.C.1952), and to prove by like evidence the period over which that entitlement extended. The intervenors, of course, are not barred from raising their other legal and factual arguments before the agency at that time.[14]

### 2.
### Method used in computing base rent levels

Temple next argues that the agency's computations of the 1973 rent levels for the

five units in the building were clearly erroneous. The agency was compelled to hypothetically set the 1973 rent figures when Temple testified that he had no record nor recollection of the precise rents he charged in 1973.

Since we have determined that the agency relied on an erroneous ground in determining that 1973 was the appropriate year from which to draw the base rents, we need not address this issue here. On remand, if 1973 remains the appropriate "base rent year," Temple may, of course, offer concrete evidence to dispute the agency's hypothetical computations.[15]

### B.
### Computation of Rent Ceiling
### 1.
### The Kirkendall Decision

■ In the Kirkendall decision, almost the full amount of the damage award accrued prior to Temple's registration.[16]

---

**14.** This court's decision in *Revithes, supra,* does not compel a contrary conclusion. In *Revithes,* the agency relied on the landlord's failure to file a Claim of Exemption Statement following a period of a bad faith claim of exemption. Indeed, the rule we upheld in *Revithes* was: "following a period of a bad faith claim of exemption, a change in status from *non-exempt to exempt* will become effective only upon the filing of a valid Claim of Exemption Statement." At 1018 (emphasis added). Here, Temple claims an exemption from the start of rent control to 1977. Thus, unlike the landlord in *Revithes,* Temple's claimed change in status is *from exempt to non-exempt.* (Clearly, Temple failed to file the required registration statement upon that alleged change in status, *see Revithes, supra,* at 1018 n. 26, but his failure to file that registration statement is precisely what he is being penalized for here.) Finally, in *Revithes,* the landlord's claim of exemption was the basis of her defense to nonregistration. Here, Temple's claim of exemption is relevant only insofar as it determines from what year to draw the base rent level.

Nor does this court's decision in *Frenkel v. District of Columbia Rental Accommodations Commission,* 432 A.2d 1226 (D.C.1981), compel that we affirm the agency's use of 1973 as the base year. The petitions in *Frenkel* were filed under the 1975 Act when the small landlord exemption had undergone numerous transitions. Thus, that decision has relevance only to

petitions filed under that Act. Moreover, *Frenkel* contains some language which must be read in context. Thus, regardless of the language in *Frenkel* concerning the procedural requirements necessary for perfecting a claim of exemption under the 1975 Act and its amendments, the holding in *Frenkel* is based on the landlord's *substantive* disqualification for exemption. The landlord rented not only a single-family dwelling but also a multi-unit, multi-story apartment building, and thus was clearly not entitled to an exemption.

**15.** We note that, should Temple still be unable to specify with more precision the rent levels of his units prior to 1977, the actual 1977 rents, which Temple supported by affidavits from prior tenants, constitute the best available evidence of the rent in 1977. Those rent levels, therefore, rather than the 1983 rent levels, should be used by the agency to compute the base rent levels "backwards" to the appropriate "base rent year," should "backward computation" prove necessary.

**16.** Hearing examiner Blaher awarded damages to Kirkendall for a period of eleven (11) months. Since Kirkendall started his tenancy on September 1, 1982, the damage award extended through July 31, 1983—six days after Temple registered his property. In the Kirkendall decision, therefore, the amount of the postregistration award is de minimis.

Since the rent of a unit may not be increased above the base rent unless the unit is properly registered, D.C.Code § 45–1519(a)(1)(B) (1981), the agency properly determined that the rent ceiling for the unit was equal to the base rent.

### 2.

### The Lobsenz Decision

In the Lobsenz decision, the hearing examiner made two determinations. First, he determined that the rent ceiling at registration was equal to the base rent. Then, he determined that subsequent to registration, Temple had not implemented any authorized increases.

Temple's argument on the inappropriateness of the rent ceiling calculation conflates these two separate determinations. Temple argues that the post-registration rent ceiling should include all automatic increases which occurred between 1973 and his registration in 1983, notwithstanding the "technicality" that Temple failed to file certificates of implementation of rent increases during that time. This argument, however, misapprehends the agency's decision. The agency prohibited Temple from including automatic increases between 1973 and 1983 in the rent ceiling *not* because of his failure to file certificates implementing automatic increases during that time, but rather, because of his fundamental failure to register. Since the statute is unequivocal in its proscription of any increases above the base rent if a building is not properly registered, *id.* § 45–1519(a)(1)(B), the agency's decision to set the "registration day" rent ceiling of all Temple's units as equal to the base rent in 1973 fully comports with the Rental Housing laws.

Temple argues, however, that this result leads to a permanent loss of all cost of living increases in the decade between 1973 and 1983. In one respect, of course, any possible hardship to Temple as a result of this determination is counterbalanced by the benefits accruing to him during the lengthy period in which he evaded rent control. More importantly, however, if Temple in fact finds himself in a financially difficult position, a hardship petition to ad-

just the rent ceiling is one of several options he may pursue. *Id.* § 45–1523. We therefore affirm the agency's decision to set the rent ceilings of all the units as of registration at the base rent level.

Of somewhat different character, however, is the hearing examiner's second determination which prohibited the taking of any increases in the base rent in the period following registration. Increases in the base rent were controlled by the following "rent ceiling" provision of the 1980 Act:

[N]o landlord of any rental unit subject to this chapter may charge or collect rent for such rental unit in excess of the amount computed by adding to the base rent not more than *all rent increases authorized* after September 30, 1980, for the rental unit by this chapter, by prior rent control laws, and any administrative decision thereunder....

*Id.* § 45–1517(a) (emphasis added).

The following types of adjustments to the rent ceiling of a unit were authorized: (1) adjustments of general applicability, *id.* § 45–1517(b); (2) hardship adjustments, *id.* §§ 45–1517(c), –1523; (3) voluntary vacancy increases, *id.* § 45–1524; (4) allowances for the cost of capital improvements, *id.* § 45–1521; (5) allowances for any increase or decrease in services and facilities, *id.* § 45–1522; (6) allowances for substantial rehabilitation, *id.* § 45–1525; and (7) voluntary agreements, *id.* § 45–1526. Temple does not argue entitlement to increases based on hardship, capital improvements, increases in services or facilities, or substantial rehabilitation in the period following registration. Therefore, we address only Temple's possible entitlement to automatic increases and voluntary vacancy increases. We address Temple's effort to adjust the rent ceiling by voluntary agreement in the next section.

The regulations in effect at the time permitted the taking of automatic increases if, among other requirements, the landlord notified the tenant thirty days in advance and filed a certificate of implementation. 14 DCMR § 3503.5 (1986). Furthermore, "a landlord who fail[ed] to implement an automatic rent increase in any calendar year

[did] not forfeit the right to implement that rent increase in a subsequent year," if the landlord filed a certificate of implementation "during the twelve (12) month period the landlord [was] entitled to implement the increase," and notified the tenant of the new rent ceiling. *Id.* § 3503.4. By contrast, in qualifying for a voluntary vacancy increase, the landlord was required, among other things, to file an amended registration form. *Id.* § 3510.2.

Here, the hearing examiner determined that:

[Temple] has failed to file certificates of implementation for automatic increases under Section 207(a) of the Act. Therefore, none are authorized. Furthermore, [Temple] has filed no amended landlord registration forms indicating any vacancy increases. Therefore, no increases beyond the 1973 base rents have been authorized.

The RHC never analyzed the hearing examiner's determination that Temple's failure to comply with procedural requirements prevented him from taking automatic or voluntary vacancy increases which may have occurred in the post-registration period.

Of course, the RHC could reasonably require strict compliance with its reporting and filing requirements: "Reporting requirements play an essential role in ensuring compliance with the rent laws. The failure to timely file reports and amended registration statements can seriously impede, if not prevent, appropriate enforcement action." *Charles E. Smith Management, Inc. v. District of Columbia Rental Housing Commission,* 492 A.2d 875, 878 (D.C.1985).

On this record, however, it appears that, following the Underdue decision, Temple attempted to have the agency establish the rent ceilings of all his units and to thereafter implement authorized increases, but the RACD was not amenable to Temple's efforts. Specifically, it appears that between December 1983 and June 1984, Temple, individually and through counsel, made several inquiries about establishing the rent ceilings of the four units other than Kirkendall's (hereinafter the "Lobsenz' units"), but was rejected at every turn.[17]

---

**17.** For example, in a letter dated June 1, 1984, counsel for Temple wrote to the Chairperson of the RHC:

I am increasingly concerned about the Commission's delay in rendering a decision in the [Kirkendall] case....

Pursuant to the hearing examiner's decision in this case the rent ceiling has been fixed at $200.00, the administratively determined rent level for the year 1973....

The Rent Administrator, Mr. John Hampton, has informed Mr. Temple in *several conversations over the past six months* that his office and RACD cannot act to determine the rent ceiling for Mr. Kirkendall's unit until the Commission decides this case. Mr. Hampton has maintained this position despite a recent determination by Mr. Michael Scott, Client Services Division, that Mr. Temple has been properly registered under rent control since last July 25, 1983....

Mr. Hampton has further advised my client that no rent ceilings for the remaining four units at 216 3rd St., S.E. can be determined until a Commission decision in this case is rendered....

Accordingly, the rent ceilings for the entire building will remain in limbo pending a Commission decision. As a consequence, *Mr. Temple is ... barred from taking rent increases otherwise authorized by law.* [Emphasis added.]

In response to that letter the Rent Administrator wrote:

At issue is whether the Rental Accommodations and Conversion Division (RACD) has the legal authority and necessary documentation to calculate the rent ceilings for the units at 216 3rd Street, S.E., excluding the unit occupied by Mr. Kirkendall.

Our review of the Landlord Registration file for the subject housing accommodation and the case jackets for [the Kirkendall case] has led us to conclude that it would be improper to calculate rent ceilings in the absence of a decision of the Rental Housing Commission (RHC).

First of all, it seems to this court that more was at issue than the rent ceiling computation of the Lobsenz' units. The issues seemed to be whether the rent ceiling of the Kirkendall unit could be increased from the $200 base rent determination and whether the rent ceilings of the other units could be established, and then increased, by authorized means. Indeed, in response to the statement by counsel for Temple that "Temple is ... barred from taking rent increases otherwise authorized by law," the RACD suggested neither the filing of certificates of implementation for automatic increases nor the amending of the registration form for vacancy increases. The RACD response to Temple's inquiry generates the unmistakable infer-

The agency apparently discouraged Temple's efforts because of the pendency of the Kirkendall appeal. The agency, however, cannot now penalize Temple for his failure to comply with the procedures necessary for implementing rent increases when the agency refused to assist in the establishment of the pre-requisite to taking lawful rent increases, namely, in the establishment of the appropriate rent ceilings.

 We therefore remand the Lobsenz decision for a determination of what automatic or voluntary vacancy increases Temple might be entitled to in the base rents of the four Lobsenz' units.[18] Temple's possible entitlement to such increases starts with the date he first made a good faith inquiry into establishing the rent ceilings of the Lobsenz' units but was met with unfavorable agency reaction.[19]

### 3.

### Invalidation of the 70% Voluntary Agreement

By statute, landlords are permitted to adjust the rent ceiling for all rental units of a housing accommodation by a specified percentage if 70% of the tenants sign an agreement to that effect. D.C.Code § 45–1526 (1981). On October 25, 1984, Temple filed a 70% voluntary agreement with RACD. Temple argues that the agen-

cy's invalidation of the agreement was error and that the rent ceilings of all the units should have been set at the figures listed in the agreement. We disagree.

On the form prescribed for the voluntary agreement, Temple listed as the "rent ceiling" the current rent of each unit, although, at that time, the agency had not determined the rent ceilings. The agreement, however, included the following typed-in statement: "[W]hile we [the tenants] are aware that the reported ceilings in Column "C" are in dispute, we wish to certify that the current rents are fair and reasonable and that they should become the ceilings for the respective apartments." The agreement was signed by three tenants.[20] Lobsenz and Kirkendall did not sign. Prior to the date of the agreement, a fire in Kirkendall's unit rendered the unit uninhabitable and thus Kirkendall no longer occupied it.

Hearing examiner Blaher determined that Kirkendall's absence from the apartment building disqualified him as a "tenant" for purposes of determining the number of tenants needed to constitute 70%. Blaher, however, invalidated the agreement on the basis of the inaccuracy of the rent ceiling on the form. The RHC affirmed Blaher's invalidation based on the inaccurate rent ceilings. The agency also deter-

---

ence that any efforts by Temple to adjust the rent ceilings pending the Kirkendall appeal would be unsuccessful. Furthermore, there is some evidence that the RACD discouraged Temple from filing a hardship petition. While the evidence before us is limited—the record seems incomplete in this respect—it seems clear that perhaps starting as early as December 1983, Temple made efforts to lawfully have the agency establish the rent ceilings of the Lobsenz' units and to adjust those ceilings, but was met with unfavorable agency reaction due to the pendency of the Underdue appeal.

18. Since the damages in the Kirkendall decision were limited to the pre-registration period, *see* note 16, *supra,* and accompanying text, this aspect of the remand is limited to the Lobsenz decision.

19. Because this court is applying principles of estoppel to prevent the agency from penalizing Temple for his failure to comply with the procedural requirements necessary to implement rent increases, Temple's possible entitlement to such increases starts on the date he attempted to have

the agency establish the rent ceilings on such units. His possible entitlement does not start at registration since the mere act of registration does not trigger authorized increases in rent ceilings.

We realize that since the period between his good faith efforts to have the agency act on the rent ceilings of the Lobsenz' units (apparently sometime between December 1983 and June 1984) and the cut-off date of the damages in the Lobsenz' decision (November 30, 1984) is relatively short, the monetary value of increasing the base rent by the possible automatic or voluntary vacancy increases which occurred in that period of time is relatively low. However, the claim is meritorious and therefore deserves the agency's consideration.

20. In a letter dated October 24, 1984, Kathleen Michels reserved her right to invalidate her consent to the voluntary agreement if the RACD made findings of fact and conclusions of law different from what Temple had stated to her.

mined that Kirkendall should have been included in the total number of tenants for purposes of determining whether 70% had signed. Since we agree that Kirkendall was still a tenant for purposes of the voluntary agreement, and since his inclusion as a tenant means that only 60% of the tenants signed the agreement, we need not address the RHC's other basis for invalidating the agreement.

 Under the rental housing laws, a tenant is a "person entitled to the possession, occupancy, or the benefits thereof of any rental unit owned by another person." *Id.* § 45–1503(30). To determine whether Kirkendall was a "tenant" at 216 Third St., S.E., after he was displaced by a fire not caused by him, we turn to two sources. First, D.C.Code § 45–1561(f) (1981) provides:

(1) A landlord may recover possession of a rental unit for the immediate purpose of making alterations or renovations to the rental unit which cannot safely or reasonably be accomplished while the rental unit is occupied....

(2) Immediately upon completion of the proposed alterations or renovations, such tenant shall have the absolute right to re-rent the rental unit.

While this provision does not directly address the rights of tenants displaced by fires not caused by them, it generates the inference that if fire damage necessitates the removal of a tenant in order to rehabilitate a unit, the displaced tenant "shall have the absolute right to re-rent" the unit upon its rehabilitation. A contrary interpretation might sanction a landlord's use of fire as a mode of evicting tenants.

Second, Kirkendall's lease was still in effect when the fire broke out. One provision of the lease stated:

That if the premises become uninhabitable by reason of fire not due to the negligence of Tenant, his family, agents

or employees, the rent herein provided shall be suspended until the premises shall have been restored to a habitable condition. Landlord shall not be obligated to rebuild or restore said premises.

Since there is no evidence that Kirkendall caused or occasioned the fire, we concur in the RHC's interpretation of this provision. Under the agency's interpretation, Kirkendall's tenancy continued, but his obligation to pay rent was suspended. Thus, under both D.C.Code § 45–1561(f) (1981) and Kirkendall's lease, Kirkendall was still a tenant in Temple's building unless and until such time as Temple rehabilitated the unit and Kirkendall rejected the opportunity to return.

Because only 60% of the tenants signed the voluntary agreement, the agency's decision to invalidate it was in accordance with law.[21] *Id.* § 1–1510(a)(3)(A).

## C.

### *Treble damages*

In both the Kirkendall and Lobsenz decisions, the rent refunds were trebled, thereby resulting in a substantial damage award. The RHC is, of course, authorized to treble damages. *Id.* § 45–1591(a). The regulations in effect at the time permitted treble damages in the following circumstances:

Refunds of rent shall be trebled unless the surrounding circumstances of the violation(s) indicate that the landlord acted in good faith, and that good cause exists for providing a single award.

14 DCMR § 3410.2 (1986).

Temple argues that the agency improperly trebled the damage award. He argues that it disregarded (1) the technical nature of his violation (*i.e.*, nonregistration); (2) the fact that the tenants had full use of the property; (3) the tenacious efforts he made to comply with the law; and (4) the fact

---

**21.** Temple's argument that Blaher had no power to "assume jurisdiction" over the 70% voluntary agreement is without merit. The agency is specifically empowered to "consolidate petitions and hearings relating to rental units in the same housing accommodation." *Id.* § 45–1527(d).

The agency's substantial interests in the efficient administration of the rental housing laws would be ill-served if the agency could not consolidate all matters relating to the determination of the appropriate rent ceilings for a previously unregistered housing accommodation.

that government error caused his nonregistration.

 All these arguments can be disposed of summarily. For all the reasons stated in Part IIA, *supra*, we do not credit Temple with tenacious efforts to comply with the law nor do we find that government error caused his nonregistration. Furthermore, treble damages have often been imposed for failure to comply with the registration requirement (which is at the heart of the rent stabilization program), *e.g., Revithes v. District of Columbia Rental Housing Commission, supra,* and despite tenants' full use of their units. *E.g., Quality Management, Inc. v. District of Columbia Rental Housing Commission,* 505 A.2d 73 (D.C.1986). Thus, Temple's arguments are unpersuasive.

Despite Temple's unpersuasive arguments, however, this court must still determine whether the agency's conclusion that no "good cause" justified a single award is supported by substantial evidence. D.C. Code § 1–1510(a)(3)(E) (1981). We find that substantial evidence supports the award of treble damages for the entire period covered by the Kirkendall decision. All the damages in that decision accrued prior to registration and Temple clearly did not act in good faith prior to that time. Furthermore, we find that substantial evidence supports the award of treble damages for the period covered by the Lobsenz decision up to Temple's first effort to have the agency lawfully establish the rent ceilings of the four non-Kirkendall units. Starting at that time, it appears from this record, *see* note 17, *supra,* and accompanying text, that Temple made good faith efforts at the RACD to have the rent ceilings of his four nonKirkendall units established, but was prevented from doing so because of a combination of agency reluctance and agency delays in the appeal process. This combination of factors constitutes "good cause" justifying a single award only.

We therefore affirm the agency's decision to award treble damages in the Kirkendall decision and we affirm the award of treble damages in the Lobsenz decision up to the point in time Temple made his first attempt to have the RACD lawfully establish the rent ceilings of the non-Kirkendall units. We remand the Lobsenz' case to the agency for their determination of the point in time in which that occurred. *See* Part IIIB2, *supra.* We vacate the award of treble damages subsequent to that point in time.[22]

## IV. REMAINING CONTENTIONS

 Temple's remaining contentions merit little discussion. Temple argues that the decisions in these actions should be reversed because an "amnesty" provision in the Rental Housing Act of 1985 prohibits the imposition of penalties on a previously unregistered landlord if the landlord complies with the registration requirement within 120 days of the effective date of the 1985 Act. D.C.Code § 45–2515(f) (1986 Supp.). Temple asserts that he registered within the requisite 120 days. Suffice it to say, however, that the 1985 Act explicitly prohibits us from applying that Act to this case: "[A] petition filed with the Rent Administrator under the Rental Housing Act of 1980 shall be determined under the provisions of the Rental Housing Act of 1980." *Id.* § 45–2593. Consequently, the amnesty provision is not available to Temple in these proceedings which were initiated by petitions filed under the 1980 Act.

Temple next asserts that the decisions must be reversed and declared void *ab initio* because they were issued by former RHC Commissioners whose terms of office had expired prior to the issuance of the decisions. Specifically, he claims that un-

---

22. This court's decision in *Harris v. District of Columbia Rental Housing Commission,* 505 A.2d 66 (D.C.1986), does not compel a contrary conclusion. In *Harris,* there was no evidence that the landlord sought to implement increases in the rent ceiling pending the intra-agency appeal. Moreover, the record was "barren of any suggestion that [the landlord] at any time complained of the pace of the proceedings or sought ... relief" from the delay. *Id.* at 71. Here, it appears that Temple attempted to have the agency establish the lawful rent ceilings of the Lobsenz' units but met with no response. Furthermore, it appears that he vigorously complained of the pace of the proceedings after the February 1984 RHC hearing.

der the 1985 Act, "[t]he terms of members of the Rental Housing Commission appointed under the Rental Housing Act of 1980 shall expire upon the confirmation of at least 2 new members appointed pursuant to this section." *Id.* § 45–2511(a). He then correctly states that the Council of the District of Columbia *voted* to confirm the appointments of the present Commission members on July 9, 1985, nine days prior to the issuance of the final decisions in ·this case.

Subsequent to the decisions in this appeal, the new Rental Housing Commission addressed this very issue. In *Graybill v. Goodman,* T/P No. 11,578 (RHC August 22, 1985), the agency engaged in an extensive analysis and concluded that "the confirmation of two successors *was effective* on July 19, 1985"—the date of the Council's publication of its resolution to confirm the new Commissioners. *Id.* at 4 (emphasis added); *see* D.C.Code § 1–1602 (1981) (unless adopted pursuant to emergency circumstances, a resolution of the Council is not effective unless it is published). For all the reasons stated in *Graybill,* we reject Temple's contention that the former Commissioners had no power to issue the decisions in this matter.

■■■ Temple finally asserts that hearing examiner Blaher acted beyond his authority in awarding damages to tenants Charles Faust and Steven Schlein who did not join the petitions of Kirkendall or Lobsenz.[23] Temple does not question the authority of the RACD to expand the scope of a proceeding to include all tenants affected by the adjudication of a petition filed by a fellow tenant. 14 DCMR §§ 3105.1–3105.4 (1986). Rather, he argues that the due process rights of Faust and Schlein are violated by the agency's decision to expand the scope of the hearing in the absence of their explicit consent. Since the interests of Temple are adverse to those of Faust and Schlein, and since Faust and Schlein have had ample opportunity to assert their rights, Temple lacks standing to make a constitutional claim on their behalf before this court. *See Barrows v. Jackson,* 346 U.S. 249, 255, 73 S.Ct. 1031, 1034, 97 L.Ed. 1586 (1953) ("[o]rdinarily, one may not claim standing in this Court to vindicate the constitutional rights of some third party"); *Singleton v. Wulff,* 428 U.S. 106, 114–16, 96 S.Ct. 2868, 2874–75, 49 L.Ed.2d 826 (1976) ("the Court has looked primarily to two factual elements to determine whether the rule [prohibiting assertion of third parties' rights] should apply. The first is the relationship of the litigant to the person whose right he seeks to assert.... [T]he relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter.... The other factual element to which the Court has looked is the ability of the third party to assert his own right.").

## V.

Pursuant to our review of the Kirkendall decision, we affirm the agency's decision and order in all respects except for its use of 1973 as the base rent year in the damage calculation. We remand the decision for a closer examination of the validity of Temple's claim of exemption prior to 1977 and the effect of such claim on the computation of the base rent level.

Pursuant to our review of the Lobsenz decision, we affirm the agency's decision and order in all respects except the following: (1) its use of 1973 as the base rent year; (2) its denial of automatic or vacancy increases in the base rents in the period following Temple's first effort to have RACD establish the rent ceilings of those units; (3) its award of treble damages for

---

**23.** Temple did not make this argument in his brief before this court although he did raise it before the RHC. Notwithstanding Temple's failure to raise this claim in his brief, the District responded to the argument in its brief. In his reply brief, then, Temple summarily stated this claim. To understand the nature of Temple's claim, therefore, we have drawn Temple's argu-

ments from his reply brief and from the brief he filed before the RHC.

In his brief before the RHC, Temple challenged only the awards to Faust and Schlein. Prior to the Lobsenz' hearing, Kathleen Michels had written a letter to the RACD requesting that the rent ceiling of her apartment be established during the Lobsenz' proceedings.

the period following Temple's first effort to have the RACD establish the rent ceilings. We remand the decision for a closer examination of the validity of Temple's claim of exemption prior to 1977. We also remand for a determination of the point in time Temple first attempted to have RACD lawfully establish the rent ceilings of the Lobsenz's units. We direct the agency to permit applicable automatic and/or voluntary vacancy increases subsequent to that time and we direct the agency to vacate the award of treble damages subsequent to such time also.

*Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.*