PEDDLERS SQUARE, INC., et al., Appellants,

v.

John E. SCHEUERMANN, Appellee.

No. 97–CV–1250.

District of Columbia Court of Appeals.

Argued Oct. 13, 1999.

Decided Feb. 1, 2001.

Gary D. Wright, Bethesda, MD, for appellants.

David B. Stratton, Washington, DC, for appellee.

Before TERRY and STEADMAN, Associate Judges, and PRYOR, Senior Judge.

Terry, Associate Judge:

The principal issue before us is whether the trial court acted properly in imposing sanctions under Super. Ct. Civ. R. 11 as it existed at the time the offending conduct occurred, rather than under the revised version of the rule, with its 1995 "safe harbor" amendment. Appellant argues that the court abused its discretion because application of the amended Rule 11 would have resulted in a finding of no violation, and hence no sanctions. In addition, appellant argues that even if the former Rule 11 applies, the award of sanctions was excessive and that the court should have held a hearing before imposing any sanctions at all. We affirm.

I

A. *Factual Background*

The District of Columbia Condominium Act of 1976 established a two-year warranty for purchasers of units in a condominium conversion project, and required that condominium developers post financial security for their warranty obligations. In 1989 Peddlers Square, Inc., a developer, converted an apartment building in Northwest Washington into a condominium and offered its individual units for sale. Peddlers Square then contracted with the Madison National Bank to issue an irrevocable letter of credit in the amount of $170,000 to secure the required statutory warranty. The beneficiaries of the letter of credit were the Unit Owners Association of the Lynshire Condominium ("the Lynshire") and the Mayor of the District of Columbia, or his designee. The letter of credit obligated the bank to disburse to

the beneficiaries, upon request, up to $170,000 for warranty repairs when presented with certain supporting documents.[1]

In the latter part of 1990, the Lynshire, which had claims under the statutory warranty, hired Carl Sontz, a professional engineer, to conduct a study of the building. Mr. Sontz's report, dated April 9, 1991, included an itemized estimate of $177,000 as the cost of certain necessary repairs. In particular, Mr. Sontz concluded that it would cost $100,000 to repair the mortar joints in the exterior brick walls and $45,000 to install firewalls in the open attic space. Relying on these estimates, the Lynshire on May 6 instructed its attorney, John Scheuermann, to draw the necessary funds from the bank in compliance with the letter of credit. Accordingly, Mr. Scheuermann sent a letter and a copy of Mr. Sontz's report to Peddlers Square advising it of the Lynshire's warranty claims and its intent to "look to this [letter of credit] to satisfy the cost of necessary repairs and/or to acquire that which is required by law." At the same time, Mr. Scheuermann notified the Mayor's Representative of his intention to draw the full amount under the letter of credit immediately, citing "[r]ecent press reports ... that the Madison National Bank was in serious financial trouble and likely to fail."

Four days later, on May 10, 1991, the draw documents were presented at the Madison National Bank. That same day, however, the bank was taken over by the Federal Deposit Insurance Corporation (FDIC), and as a result the money sought under the letter of credit could not be paid. After a series of other events not pertinent to this appeal, the Lynshire directed Mr. Scheuermann to file suit on its behalf against Peddlers Square, based on the alleged warranty violations. He did so on April 28, 1992.

While the suit against Peddlers Square was pending, the FDIC, which had initially repudiated the letter of credit, decided in September 1992 that it would approve the draw. The first payment of $71,255.50 under the letter of credit was made on September 25, 1992, with a statement that other payments were to follow. After negotiations with the Mayor's Representative, it was agreed that these funds would be held in an interest-bearing trust account, with Mr. Scheuermann as trustee, and that he would disburse money as needed to the Lynshire for warranty-related expenses, upon receipt of invoices or other suitable documentation.

On October 13, 1992, Mr. Scheuermann filed a motion to dismiss the Lynshire's suit against Peddlers Square on the ground that the money sought "had been paid ... and recovery from [Peddlers Square] would, in effect, 'duplicate the compensation already received (and to be received) from the FDIC.'" Mr. Scheuermann served a copy of the motion on Peddlers Square's counsel and informed him that he intended "to place all funds received ... into an account in trust in the names of the city and the condominium for the specific purpose of effectuating repairs." The motion to dismiss, which Peddlers Square did not oppose, was granted in November 1992. Over the next two years, Mr. Scheuermann disbursed approximately $65,000 from the trust account to the Lynshire for repairs to the building and related services, for which the Lynshire provided invoices.

In June 1993, Craig Bernstein, the president of Peddlers Square, noticed scaffolding on the Lynshire building. According to Mr. Bernstein, this was the first time

1. The draw documents had to be accompanied by the original letter of credit and a statement that the draw was being sought under the warranty requirement of the Condominium Act. In addition, by its express terms, any draft against the letter of credit had to be presented on or before July 30, 1991.

Peddlers Square became aware that funds had been drawn under the letter of credit. Thereafter Peddlers Square, through its counsel, requested Mr. Scheuermann to cease all disbursement of these funds. Mr. Scheuermann rejected the request, however, and the warranty repairs continued.

On January 24, 1994, Peddlers Square and six of its principal owners [2] filed suit against the Lynshire, Mr. Scheuermann, the Lynshire's property management company, and the District of Columbia. The complaint alleged, *inter alia*, that the defendants had committed fraud in drawing funds under the letter of credit. Specifically, Peddlers Square asserted that the Lynshire and Mr. Scheuermann knew that the Sontz report was inaccurate and contained "false representations of material facts as to the soundness of the structure ... and the quality of the construction," and that they had used this false information to induce the Madison National Bank and the FDIC to honor the draw. In support of this assertion, Peddlers Square stated that it had retained its own expert, Harvey Fernebok, in May 1991 to study the alleged structural deficiencies of the Lynshire building. Mr. Fernebok's written report, of which Peddlers Square alleged the Lynshire and Mr. Scheuermann were aware, disputed many of Mr. Sontz's findings.

On August 11, 1994, the trial court dismissed Peddlers Square's complaint as to the management company and the District of Columbia. As against the Lynshire, the court dismissed the fraud count without prejudice but allowed the unjust enrichment and conversion counts to remain pending. As to Mr. Scheuermann, the fraud count was dismissed without prejudice for inadequate pleading, with leave to file an amended complaint within thirty days. All other counts were dismissed with prejudice.

Peddlers Square then filed an amended complaint, followed by a supplement, which essentially realleged the original fraud count. In response, Mr. Scheuermann filed a motion to dismiss and a motion for summary judgment, arguing that the Sontz report was not false and that, in any event, he did not even receive a copy of the Fernebok report until after the draw documents were presented at the bank. He also pointed out that "[o]ne cannot identify the alleged false representations, forming the basis for this suit, simply by comparing the Sontz engineering report with the Fernebok report. In some instances Fernebok agrees with the findings of the Sontz Report, but conclude[s] that the developer was not responsible; in other instances, Fernebok simply notes that the repair work had already been done prior to his inspection." The trial court denied Mr. Scheuermann's motions, and the litigation continued.

As the case proceeded through discovery, Peddlers Square and the Lynshire began settlement negotiations. Mr. Scheuermann, on the other hand, made clear that he would not agree to any "resolution of this litigation that suggest[ed] that the fraud claim against him had any merit." According to Mr. Scheuermann, Peddlers Square was "placed on notice repeatedly, by letters dated March 21, 1994, September 15, 1994, and January 6, 1995, of [his] intent to seek Rule 11 sanctions."

### B. *The Rule 11 Motion*

On April 30, 1996, Mr. Scheuermann served Peddlers Square with his motion for sanctions under Rule 11. On May 13, however, Peddlers Square and the Lynshire reached a settlement agreement and later filed a consent motion to dismiss the case. Mr. Scheuermann opposed dismissal and filed his Rule 11 motion with the court on May 22. On May 29 the court entered

---

**2.** The named plaintiffs other than Peddlers Square, all members of the same family, were individual guarantors of the letter of credit.

an order dismissing the case "with prejudice as to all claims and parties, except for defendant Scheuermann's Motion for Rule 11 Sanctions, which is separate and apart from the main action, and which the court will consider after plaintiffs have filed their opposition. . . ."

In his Rule 11 motion, Mr. Scheuermann asserted that the letter of credit, by its express terms, required only that the Lynshire and the Mayor's Representative present certain specified documents to draw upon the credit, and that those documents were in fact presented. Moreover, he said, the Madison National Bank, which issued the letter of credit, and its successor the FDIC, were not required to review any engineering reports, and there was no evidence that they did so, nor did the letter of credit itself contain any requirement that an engineering report detailing the necessary repairs be submitted with the draw documents. Finally, the Lynshire had the right, subject to the terms of the letter of credit, to use the credit in any manner and in any amount up to $170,000. Accordingly, Mr. Scheuermann argued that a reasonable pre-filing inquiry by Peddlers Square would have revealed that the allegations against him were false.

Mr. Scheuermann went on to identify numerous allegations made in violation of Rule 11 in the original complaint and incorporated by reference in the amended complaint. In particular, he pointed out (1) that the allegation that he had failed to notify Peddlers Square before presenting the draw documents was false, since he sent a letter by certified mail on May 6, 1991, to Craig Bernstein, the president of Peddlers Square, stating that the Lynshire would look to the letter of credit to satisfy warranty repairs; (2) that the allegation that he had received payments under the letter of credit since May 11, 1991, was false, since the first disbursement was not received until September 25, 1992; (3) that the allegation that he had filed suit against Peddlers Square for warranty violations on April 28, 1992, while in possession of pro-

ceeds from the letter of credit was false, since he did not receive the first distribution until September 25, 1992; (4) that the allegation that he had failed to notify Peddlers Square during the pendency of the civil action that he had received a distribution under the letter of credit was false, since the motion to dismiss the suit against Peddlers Square included a copy of the check from the FDIC; and (5) that the allegation that he had failed to disclose the amount of the distribution received on September 25, 1992, was false, since receipt of the check was fully disclosed in Mr. Scheuermann's motion to dismiss the suit against Peddlers Square, filed on October 13, 1992, and served on Peddlers Square.

Peddlers Square filed an opposition arguing that, under the 1995 amendments to Rule 11, Mr. Scheuermann's motion for sanctions should be denied because it had moved to dismiss the case with prejudice within twenty-one days after being served with the motion for sanctions. After considering arguments from both sides, and concluding that it would be "fair and just to consider the motion under Rule 11 as it existed at the time of the offending conduct at issue, and not under the revised version of Rule 11, with its 1995 amendments," the court granted Mr. Scheuermann's motion for sanctions. The court ordered that Mr. Scheuermann file an affidavit of costs in support of his claim for reasonable expenses, including attorney's fees.

As directed, Mr. Scheuermann filed an affidavit showing that he had spent $49,090.41 in costs and attorney's fees and expenses from the date the original complaint was filed. Of this amount, Mr. Scheuermann had to pay the initial $10,000 in attorney's fees and expenses out of his personal funds because that was the deductible amount under his insurance policy. The remaining funds were paid by Mr. Scheuermann's malpractice carrier. Peddlers Square filed a response arguing that it should not be sanctioned for attor-

ney's fees that Mr. Scheuermann was not required to pay personally.

The court awarded Mr. Scheuermann the full amount specified in the affidavit, stating that "the insurance company's fees and expenses were reasonably incurred in defending against non-meritorious claims filed by parties who did not conduct a reasonable pre-filing investigation of facts or law, and who persisted with those claims after the lack of merit was made known to them by a warning that the defendant intended to pursue Rule 11 sanctions." This appeal followed.

## II

### A. The Amended Rule 11

■ Peddlers Square's first argument is that the trial court erred by not applying the amended Rule 11 to the instant case. At the time the original complaint was filed by Peddlers Square against the Lynshire in 1994, Rule 11 did not include a "safe harbor" provision. Under the rule as it then existed, a sanction could be imposed for a violation of the rule once the paper or pleading at issue was filed with the court. While the case was pending in the trial court, however, Rule 11 was amended to provide that a motion for sanctions "shall not be filed with or presented to the court unless, within 21 days after service of the motion ... the challenged paper, claim, defense, allegation or denial is not withdrawn or appropriately corrected." Super. Ct. Civ. R. 11(c)(1). This amendment took effect on June 1, 1995.

■ This court has made clear that "'[b]y the general rule of law, the procedure in an action is governed by the law regulating it at the time any question of

procedure arises.'" *Montgomery v. District of Columbia,* 598 A.2d 162, 166 (D.C. 1991) (citation omitted). In the present case, the original complaint, the first amended complaint, and the supplement to the first amended complaint were all filed in 1994. Therefore, because the former Rule 11 was in effect at the time of filing of the pleadings which triggered the sanctions, the former Rule 11 may be applied here. *Bredehoft v. Alexander,* 686 A.2d 586, 588 (D.C.1996). Consequently, Peddlers Square cannot rely on the fact that the pleadings were properly withdrawn pursuant to Rule 11 as amended in 1995.

■ Moreover, even when the amended Rule 11 is applicable,[3] the trial court has broad discretion to decide whether to impose sanctions under the rule. We review such rulings only for abuse of discretion. *See, e.g., Park v. Sandwich Chef, Inc.,* 651 A.2d 798, 802 (D.C.1994); *Knipe v. Skinner,* 19 F.3d 72, 78 (2d Cir.1994) ("a just and practicable application of the amended Rule 11 requires that the [trial] court be afforded an opportunity to exercise its discretion whether to impose sanctions").[4] · In the present case, the trial court specifically concluded, in light of the record as a whole, that it would be "fair and just to consider the motion under Rule 11 as it existed at the time of the offending conduct at issue." Given that the pleadings which gave rise to the Rule 11 motion were all filed long before the effective date of the amendment, and following our deferential standard of review, we find no abuse of discretion in that determination.

### B. The Rule 11 Violation

■ Peddlers Square next contends that its conduct did not fall to the level

---

**3.** In adopting the amendments to Rule 11 in 1995, the Superior Court Board of Judges specified that they should govern pending proceedings "insofar as is just and practicable."

**4.** *Knipe* and other federal cases cited in this opinion involve Fed.R.Civ.P. 11, which is virtually identical to its Superior Court counter-

part. We have repeatedly held that when a federal rule and a local rule contain the same language, "we will look to federal court decisions interpreting the federal rule as persuasive authority in interpreting the local rule." *Montgomery v. Jimmy's Tire & Auto Center, Inc.,* 566 A.2d 1025, 1027 (D.C.1989) (citations omitted).

requiring sanctions even under the former version of Rule 11. "This court reviews for abuse of discretion both a trial court's determination that Rule 11 .was violated and the amount of sanctions ordered." *Cunningham v. Bathon,* 719 A.2d 497, 499 (D.C.1998) (citation omitted). Under the version of Rule 11 in effect at the time the pleadings were filed, a trial court's decision to impose sanctions was a two-part process. *Kennedy v. District of Columbia,* 654 A.2d 847, 859 (D.C.1994). First, the trial court must decide whether a Rule 11 violation occurred; if it did, then the court was required to impose a sanction. *Montgomery v. Jimmy's Tire & Auto Center, Inc.,* 566 A.2d 1025, 1028–1029 (D.C.1989).

In considering whether Rule 11 had been violated, the trial court focused only on whether a "reasonable pre-filing inquiry would have disclosed that the pleading, motion, or paper was not well grounded in fact, was not warranted by existing law, or was interposed for an improper purpose." *Kennedy,* 654 A.2d at 859. After doing so, the court concluded:

[S]anctions are appropriate in this case [because] several of the allegations of the complaint were downright false, as plaintiffs plainly knew or should have known when the pleadings were filed. Moreover, the allegations of fraud against defendant Scheuermann, an attorney, could not have been made after reasonable inquiry into the facts and the existing law relating to the fraud allegations.

Thus the court held that "[t]he lawsuit against defendant Scheuermann had no basis in fact or in law." That holding is clearly supported by the record.

Peddlers Square's theory throughout these proceedings had been that Mr. Scheuermann fraudulently induced the bank to honor the draw under the letter of credit and did not adequately inform Peddlers Square of his receipt of the funds. The record directly undermines this theory. First, on May 6, 1991, more than two years before Peddlers Square filed suit,

Mr. Scheuermann sent a letter to Carl Bernstein, the president of Peddlers Square, stating the Lynshire's intention to "look to this [letter of credit] to satisfy the costs of necessary repairs. . . ." Second, the letter of credit, by its express terms, required only that the draw documents be accompanied by two documents: (1) a statement from the Mayor of the District of Columbia that the amount of the draw was in accordance with the D.C. Condominium Act and (2) the original letter of credit. On May 10, 1991, those documents were presented at the bank. Contrary to appellant's assertions, even assuming that the Sontz report was false, there is no evidence either that it was presented to Madison National Bank or that the bank (or its successor, the FDIC) relied on the report as a condition of honoring the draft. In short, the procedure for drawing funds under the letter of credit was followed precisely.

Third, it was not until April 28, 1992, after the FDIC had informed the Lynshire that the letter of credit was repudiated but before the FDIC changed its mind and agreed to make the payments, that the Lynshire filed suit against Peddlers Square based on the warranty violations. The first disbursement under the letter of credit was not made until September 25, 1992. Less than three weeks later, on October 13, the Lynshire dismissed its suit and informed Peddlers Square's counsel and the Mayor's Representative of its intention to place the funds in an interest-bearing trust account. On July 9, 1993, Mr. Scheuermann sent a letter informing Peddlers Square's counsel that he had received a check in the amount of $71,255.50 and that he had made two disbursements to the Lynshire for warranty repairs. Lastly, Mr. Bernstein acknowledged in a deposition that Mr. Scheuermann did not have anything to do with "creating the specifications for the repair work [or] the hiring of the subcontractors."

Despite this knowledge, Peddlers Square nevertheless filed its initial com-

plaint alleging fraud by Mr. Scheuermann on January 24, 1994, followed by a first amended complaint on September 14, 1994, and a supplement to the first amended complaint on November 4, 1994. These allegations of fraud find no support in the record. Rather, a reasonable pre-filing inquiry would have revealed no factual or legal basis for a fraud claim against Mr. Scheuermann. Therefore, given the total lack of substance of Peddlers Square's claims against Mr. Scheuermann, aggravated by its persistence, we readily conclude that the trial court did not abuse its discretion in finding a Rule 11 violation.[5]

### C. *The Amount of the Award*

■ Peddlers Square also contends that the amount of the sanction was not reasonable and that the court should have held a hearing before ruling on Mr. Scheuermann's motion. In particular, Peddlers Square maintains that the trial court should not have awarded sanctions based on expenses incurred by Mr. Scheuermann's insurance carrier in defending the suit. Rule 11, however, requires only that the sanction be "appropriate" and that costs and attorney's fees be "reasonable." *Williams v. Board of Trustees of Mount Jezreel Baptist Church*, 589 A.2d 901, 911 (D.C.1991). In this regard, the Supreme Court has said that "the central purpose of Rule 11 is to deter baseless filing ... and thus ... streamline the administration and procedure of the ... courts." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990). While this court has not directly considered the effect of insurance on Rule 11 sanctions, it has identified at least four factors which the trial court should consider when imposing a monetary sanction: (1) "the reasonableness of the injured party's attorneys' fees," (2) "the minimum amount that will serve to adequately deter the undesirable behav-

ior," (3) "the offending party's ability to pay," and (4) "the degree to which malice or bad faith contributed to the violation, the risk of chilling the type of litigation involved, and other factors as deemed appropriate in individual circumstances." *Williams*, 589 A.2d at 912 (citations and internal quotation marks omitted).

The Eleventh Circuit has upheld an award of Rule 11 sanctions in a similar factual setting. In *Pelletier v. Zweifel*, 987 F.2d 716 (11th Cir.), *cert. denied*, 510 U.S. 918, 114 S.Ct. 311, 126 L.Ed.2d 258 (1993), the court affirmed an order imposing sanctions despite the fact that the award compensated the defendant's insurance carrier and not the defendant himself. The defendant in *Pelletier* established that he had incurred $282,837.96 in attorney's fees and litigation expenses in defending the case in the trial court. On appeal the plaintiff challenged the award, arguing that the defendant was "entitled to recover nothing because he had 'incurred' no litigation expense at all; rather, his insurance company had incurred and paid the expenses." *Id.* at 717. Rejecting this argument, the Eleventh Circuit declared:

> It is of no moment that Zweifel purchased insurance to cover the expense of defending claims.... [Plaintiffs] are not entitled to "free" violations of Rule 11 because of Zweifel's prudence in investing in insurance coverage.

*Id.* at 718. The court held accordingly that the plaintiffs' argument that the defendant "cannot recover what he may have to pay over to the insurance company in satisfaction of its subrogation rights is patently frivolous." *Id.* at 718–719. We agree with the holding in *Pelletier* and accordingly reject Peddlers Square's argument as "patently frivolous."

■ In this case the trial court awarded Mr. Scheuermann $49,090.41. Like the

---

5. We express no opinion as to the underlying dispute between Peddlers Square and the Lynshire, which was eventually settled. Whatever the merits of that dispute may have

been, there was no justification for naming Mr. Scheuermann as a defendant and keeping him in the case as a party for over two years.

Eleventh Circuit, the trial court concluded that "there is no apparent reason why plaintiff's Rule 11 penalty should be mitigated by the fortuity that defendant Scheuermann happened to have insurance." In addition, the court considered many of the factors which we enumerated in *Williams*, stating:

Plaintiffs were warned early in the litigation that Scheuermann should not be a defendant and that he would seek Rule 11 sanctions, yet they persisted with their frivolous claims against him. The fees charged are fair and reasonable on their face. The primary purpose of Rule 11 is to deter non-meritorious litigation, and one of the best ways to accomplish deterrence ... is to make a party who files a lawsuit without reasonable pre-filing investigation of facts or law pay the actual cost of the defense.

\* \* \* \* \* \*

... When plaintiffs elected to pursue their non-meritorious claims, they had no way of knowing whether defendant had insurance or what part of his defense costs would be taken up by the insurance. Indeed, to the extent the plaintiffs may have assumed Scheuermann carried liability insurance and took that assumption as a green light to pursue claims they might otherwise have thought twice about, that would be all the more reason to include in the Rule 11 sanction the insurer's portion of the attorneys' fees and expenses.

We are satisfied that the imposition of a sanction against Peddlers Square based on Mr. Scheuermann's costs and attorney's fees for more than two years of litigation was not unduly harsh. That sanction was based on Mr. Scheuermann's detailed affidavit documenting expenditures, hours of attorney time, rates charged, and specific work performed. In addition, the court recognized that the sanction was necessary to deter future frivolous suits of the type exemplified here. We review "all aspects of a [trial] court's Rule 11 determination" for abuse of discretion, *Cooter & Gell*, 496 U.S. at 405, 110 S.Ct. 2447, and on this record we find none.

■ Finally, Peddlers Square maintains that it was entitled to a hearing on the motion for sanctions before the motion could be granted. This argument is equally without merit. Super. Ct. Civ. R. 12 I(f), which deals generally with motions practice, plainly states that the court in its discretion may decide any motion without a hearing.[6] *See Williams*, 589 A.2d at 911; *Montgomery*, 566 A.2d at 1031 ("while Rule 11 procedures must comport with due process, a hearing is not required in every case" (citations omitted)); *Pagan v. Horton*, 464 A.2d 146, 148 (D.C.1983). In this case the judge who imposed the Rule 11 sanctions had participated in every aspect of the proceedings, and he specifically ruled that "a hearing is not necessary to determine that plaintiffs violated Rule 11." Peddlers Square has failed to persuade us that this ruling was erroneous in any way.

The judgment is accordingly

*Affirmed.*

---

6. Rule 12–I(f) provides in pertinent part:

A party may specifically request an oral hearing ... but the court in its discretion may decide the motion without a hearing.