**BREEZEVALE LIMITED,**
Appellant/Cross–
Appellee,

v.

**Timothy L. DICKINSON, et al.,**
Appellees/Cross–Appellants.

Nos. 03–CV–615, 03–CV–634.

District of Columbia Court of Appeals.

Argued Dec. 8, 2004.
Decided Aug. 4, 2005.

Stephen D. Susman, Houston, TX, with whom Leslie A. Powell and Diana M. Schobel, Frederick, MD, were on the brief, for appellant/cross-appellee.

Theodore J. Boutrous, Jr., Los Angeles, CA, with whom Jonathan K. Tycko, Hassan A. Zavareei, Washington, DC and John H. Sharer, were on the brief, for appellees/cross-appellants.

Before SCHWELB and REID, Associate Judges, and STEADMAN, Senior Judge.

STEADMAN, Senior Judge:

This case comes to us for the second time on an appeal from a trial court order imposing upon appellant Breezevale a total of $5,061,353 in attorneys' fees and punitive damages, in addition to dismissal of its cause of action for legal malpractice, as a consequence of the trial court's finding by clear and convincing evidence that Breezevale knowingly brought the litigation in principal reliance upon documents that it knew to be forgeries. We sustain the dismissal and the award of attorneys' fees. Both of these sanctions in the circumstances here bear punitive elements, a factor that the trial court did not sufficiently take into account. Accordingly, we vacate the separate award of punitive damages as excessive. In all other respects, we affirm.

## I. Litigation History

The circumstances behind the litigation in this case and the trial court's imposition of sanctions have been set forth at length in the prior appeal to this court and need only be briefly outlined here. *See Breezevale Ltd. v. Dickinson,* 759 A.2d 627 (D.C. 2000) (*"Breezevale I"*). The present dispute began in October 1989, when Breezevale hired Gibson, Dunn & Crutcher LLP ("GDC") to represent the company in a contractual dispute with Bridgestone–Firestone, Inc. ("Firestone"). During trial preparation, it came to light that Rebecca Paul, a Breezevale employee, intended to testify during her deposition that she had personally forged documents, namely spreadsheets and offer letters, which related to Breezevale's claims against Firestone. Moreover, Ms. Paul maintained that these forgeries were performed at the direction of and with the participation of top Breezevale executives.

GDC's response to Ms. Paul's revelation is what formed the basis for Breezevale's malpractice action. Rather than postpone the deposition, GDC elected to go forward as planned; GDC did not initially notify Breezevale of Ms. Paul's anticipated testimony. When GDC did eventually alert a Breezevale executive to the impending testimony prior to the afternoon session of Ms. Paul's deposition, the executive immediately asserted that Ms. Paul was lying and asked GDC to delay the testimony until the allegations could be further investigated. GDC refused and Ms. Paul proceeded to give her damaging testimony. Firestone's attorneys immediately began drafting a motion to dismiss all of Breezevale's claims with prejudice as a sanction for fraud and misconduct. Upon threat of imminent filing of the motion, and at GDC's behest, Breezevale settled with Firestone for $100,000.[1]

In October 1994, Breezevale brought a claim for legal malpractice against GDC in the District of Columbia Superior Court. In its complaint, Breezevale alleged that "[h]ad [GDC] conducted a competent and thorough investigation of [Ms. Paul's] allegations, they would have discovered that such allegations of wrongful conduct by Breezevale or its principal executives were untrue." According to Breezevale, by not conducting an adequate investigation of the employee's allegedly false claims, GDC violated the legal standard of care and irreparably damaged Breezevale's suit against Firestone. Thus, in its malpractice suit against GDC, Breezevale contin-

---

1. Prior to Ms. Paul's testimony, Breezevale had rejected a settlement offer of $3.5 million.

ued to assert that the allegedly forged documents were in fact genuine, and litigated its claim in Superior Court accordingly.

A seven-week trial was held during which the parties litigated both the legal malpractice claim and the underlying "case within a case" in order to determine what a "hypothetical jury" would have awarded Breezevale had its case against Firestone actually gone to trial. Utilizing a special verdict form, the jury found in favor of Breezevale on the legal malpractice claim. Specifically, the jury found that GDC had breached the standard of care in its representation of Breezevale and thereby proximately caused damage to Breezevale's case against Firestone. However, the jury further found that forgeries did in fact occur with the participation of "one or more Breezevale executives." Nevertheless, the jury also found that such forgeries did not "play[ ] a substantial part in damaging" Breezevale's lawsuit against Firestone and that Breezevale still would have won three of its claims for a total of $3,430,000.

Notwithstanding the jury's verdict, the trial court entered judgment as a matter of law in favor of GDC. In the alternative, the court granted GDC's motion for a new trial. In addition, the trial court granted GDC's equitable counterclaim for "bad faith litigation." Consistent with the jury's factual finding by a preponderance of the evidence, the court found by clear and convincing evidence that forgery had occurred with the participation of one or more Breezevale executives. Accordingly, the court concluded that Breezevale acted in "bad faith" by continuing to maintain before the court that the documents were not forgeries and that the employee was lying, despite the overwhelming evidence to the contrary. Proclaiming that it was "difficult to imagine a clearer case of bad faith litigation," the court imposed the following sanctions: (1) $4,061,353 for GDC's fees and costs in litigating the malpractice action; (2) $1,000,000 in punitive damages; and (3) $295,280 in unpaid legal fees.

On appeal, this court addressed a number of Breezevale's arguments. First, the court concluded that the trial court erred in awarding judgment as a matter of law because "[l]ooking at the record in the light most favorable to Breezevale," it could not "agree with the trial court that there was no evidence from which a reasonable jury could find" in Breezevale's favor. *Breezevale I,* 759 A.2d at 634. Second, the court remanded the case to the trial court to "consider further its grant of a new trial," since the trial court's "summary grant of a new trial by reference to the judgment notwithstanding the verdict, without express consideration of the evidence on both sides and its relative weight, cause[d] difficulty in terms of appellate review." *Id.* at 638. As to sanctions, the court vacated all sanctions "without prejudice to a decision whether to impose an award following an exercise of discretion based on correct legal principles." *Id.* at 640. The court was careful to caution, however, that it did "not intend to suggest that Breezevale [was] necessarily beyond the sanctioning power of the trial court on remand," nor that "the trial court lack[ed] authority to sanction parties for illegal or unethical litigation tactics simply because their substantive claims have some merit." [2] *Id.* A rehearing *en banc* was held,

---

2. Judge Schwelb wrote a concurring opinion in which he was even more explicit:

> [The trial court's findings] find overwhelming support in the record, and they must ultimately inform the court's exercise of discretion in the imposition of sanctions.

I think . . . . it is significant that Breezevale's key allegation in the malpractice case was untrue and known by Breezevale to be untrue. The testimony offered in support of that allegation was likewise false. The final

whereupon the *en banc* court "adopt[ed] and reaffirm[ed] the appellate rulings . . . ." *Breezevale Ltd. v. Dickinson,* 783 A.2d 573, 575 (D.C.2001) (*"Breezevale II"*).

On remand, the trial court focused on the issue of sanctions. First, the court ruled that Breezevale was not entitled to a new hearing on sanctions, declaring that "[g]iven the exhaustive litigation of the forgery issue before the jury, there would have been no point in additional proceedings before the bench on the very same question." Second, the court granted the "ultimate sanction" of dismissal of Breezevale's claim. Reasoning that "the forgery issue should never have been made central to [the malpractice case]" and "[b]y making it a major component of its malpractice suit against GDC, Breezevale perpetrated a fraud on the court," the court concluded that dismissal of the action was justified under the circumstances. Third, the court reimposed the same monetary sanctions, ordering Breezevale to pay $4,061,353 in attorneys' fees and costs, and $1 million in punitive damages.[3] The punitive damages were awarded based upon "Breezevale's persistent refusal to acknowledge its wrongdoing." Breezevale filed a timely appeal, and we find ourselves yet again addressing this dispute.

## II. Substantive Findings

Breezevale challenges the substantive findings of the trial court on three grounds. We conclude that each claim lacks merit.

### A.

Breezevale first asserts that the evidentiary record before the trial court did not support its finding by clear and convincing evidence that the documents were known forgeries, which formed the basis of the court's order of sanctions against Breezevale. Although GDC initially filed its request for sanctions against Breezevale as a "counterclaim," the trial court's (as well as our own) treatment of the issue is more appropriately viewed as a motion for sanctions based upon "abuse of the judicial process." *See Breezevale I,* 759 A.2d at 639 n. 18. The trial court has inherent power to sanction parties for intentionally abusing the litigation process. *Id.* We made clear in *Breezevale I* that, given this inherent power, "sanctions may properly be imposed against a party found to have forged documents in an apparent attempt to bolster a portion of its case and then steadfastly lied about it while litigating another case . . . ." *Id.* at 639. Accordingly, sanctions may properly lie against *Breezevale* so long as there is sufficient evidence that Breezevale knew the documents at issue were forgeries, yet continued to assert that they were genuine. The trial court so found, and its "findings of fact can be reversed only if they are plainly wrong or without evidence to support them." *Jemison v. Nat'l Baptist Convention, USA, Inc.,* 720 A.2d 275, 281 (D.C. 1998).

There was ample evidence supporting the court's finding that documents were forged with the knowledge and participation of Breezevale executives. First,

---

disposition of this case should reflect this underlying reality.

*Id.* at 642 (footnote omitted).

**3.** The court did, however, enter judgment for Breezevale on GDC's counterclaim for unpaid fees and costs related to the Firestone litigation, finding that "the value of GDC's representation was so diminished after the breach that it would be inequitable to make Breezevale pay for any part of it." GDC does not appeal from this ruling. Finally, as an alternative to its sanction of dismissal, the court granted GDC's motion for a new trial. In light of our disposition affirming the dismissal of Breezevale's claim, we need not address this ruling.

there was the testimony of Rebecca Paul, the Breezevale employee who initially revealed that the documents were forged. Ms. Paul testified that she was directed by Breezevale executives in February 1991 to manufacture spreadsheets and offer letters and to "back date" them to November and December 1987. Ms. Paul described in some detail how she and Abou Jaoude, a Breezevale executive, worked together to forge documents over the course of three days in February 1991. The court credited Ms. Paul's testimony, pointing out that she had no discernable motive to lie. Breezevale asserted that Ms. Paul made up her testimony in an effort to sabotage the company. The court found Breezevale's position implausible, however, since it would require an otherwise loyal employee of ten years to sacrifice her job, implicating herself in serious misconduct and committing perjury in the process, for no plausible reason. We agree, and defer to the trial court's positive assessment of Ms. Paul's credibility.

In addition to Ms. Paul's testimony, there were several other notable pieces of evidence which support a finding of forgery. The documents at issue were purportedly hand-delivered between Beirut and Iraq in 1987. However, considering that Breezevale's normal course of transmitting offer letters in 1987 was to send them via Telex communications, there appears no logical explanation for why hand-delivery was opted for on this occasion. Several former Breezevale employees testified that all Breezevale–Iraq business was handled through the London office. Although one Breezevale executive, Jaoude, testified to the contrary, the trial court discredited his testimony as self-serving and incredible. The court concluded that "it would defy common sense and good business practice to hand deliver offer letters from Beirut when instant and far more reliable communication was available via London," and this conclusion finds support in the record.

Moreover, the trial court found it especially "puzzling" that Jaoude never signed any Firestone-related documents sent to Iraq before or after 1987, despite his testimony that he was responsible for that business beginning in 1985. Jaoude was also the only witness who testified to having actually seen the disputed documents in 1987. Although all records pertaining to Breezevale's Iraq business were maintained in London, these particular documents, purportedly prepared in 1987, did not find their way to the London office until February 1991. The court found it telling that neither the secretary who allegedly typed the documents, nor the employee who allegedly delivered them to Baghdad, were called to testify; nor was the pre–1991 typewriter on which some of the documents were claimed to have been typed, introduced into evidence.

The court also based its finding on a detailed examination of the documents themselves, which were admitted into evidence. A document dated February 25, 1987 was computer generated, even though by Jaoude's own testimony, Breezevale did not yet own computers at that point. Although Breezevale claimed that Ms. Paul fabricated this particular document on her own initiative, this explanation was belied by Jaoude's handwritten notations on the document. A computer evidence expert testified that both this document and a similar one with Jaoude's handwriting on it were produced on Ms. Paul's computer with a last access date of February 21, 1991, thus corroborating Ms. Paul's testimony that the documents were created at that time. Other evidence of forgery includes the fact that two documents (each with Jaoude's signature) were typed on a letterhead which did not exist in 1987.[4]

---

4. The letterhead contained the name and ad- dress of "Breezevale Incorporated, New Jer-

Although Jaoude denied having signed these documents, the court credited the testimony of a handwriting expert who concluded with "no reservation whatsoever" that it was indeed Jaoude's signature on the documents. In short, the court found that the evidence lead to the "inescapable conclusion" that the documents at issue were forged, and this conclusion is supported by substantial evidence in the record.

Breezevale argues that even if there was clear and convincing evidence of forgery, there was insufficient evidence to show that the top two Breezevale executives, Habib Bou Habib and Charles Awit, participated in or were aware of such forgery.[5] Breezevale contends that so long as these executives believed that the documents were genuine, it could not constitute "bad faith" for Breezevale to have maintained as such at trial. We note at the outset that the crucial determination supporting the court's finding of bad faith litigation is the knowledge of Breezevale executives at the time they instituted the malpractice action against GDC, rather than at the time the forgery occurred. Regardless of whether Breezevale executives knew of the forgery prior to Ms. Paul's revelation, once Ms. Paul's allegations came to light, Breezevale was on notice of potential forgery. *Cf. Clay Properties, Inc. v. Washington Post Co.*, 604 A.2d 890, 896 (D.C.1992) (en banc) (discussing circumstances where a person of ordinary prudence is required to make inquiry or investigate further). Once these serious allegations were made, it became incumbent upon Breezevale to conduct a thorough investigation. At the very least, Breezevale executives would be expected to gain reasonable assurance that the documents were genuine prior to initiating a law suit in which they would make such a representation.[6]

As the preceding discussion illustrates, there was substantial evidence showing that the documents were in fact forgeries; indeed, the evidence was "clear and convincing." Inquiry would have indicated what both a jury and a trial court found evident—that the documents were forgeries, and it is not unreasonable to infer that such an inquiry was in fact made or deliberately avoided. Under the circumstances, all three Breezevale executives must be deemed to have known that the documents were forged by the time they initiated the malpractice claim against GDC.

In any event, there was clear evidence to support a finding that each of the three top Breezevale executives participated in the forgery scheme. Ms. Paul's testimony, which was credited by the trial court, not only implicated Jaoude in the forgery, but Habib and Awit as well. She testified that when she informed Habib that there were no Iraq offers in 1987, he responded to her that "we better think about making sure there [are]." Soon afterwards, Jaoude directed her to start forging spreadsheets and offer letters. Ms. Paul also testified that she observed several conversations between Jaoude and Awit during which

sey," a subsidiary that had not yet been formed.

**5.** Jaoude was the second highest ranking officer at Breezevale from 1982 until 1995. At the time of trial, however, he was no longer working in an official capacity with Breezevale, although he was admittedly still closely associated with the company.

**6.** Closely analogous, Rule 11 imposes an obligation to conduct a *reasonable inquiry* prior to filing a complaint so as to ensure that the allegations and other factual contentions have evidentiary support. Super. Ct. Civ. R. 11(b)(3); *see Cunningham v. Bathon*, 719 A.2d 497, 499 (D.C.1998) (imposing sanctions on a litigant and his attorney for failing to conduct a reasonable inquiry prior to filing a complaint alleging *inter alia* fraud).

they discussed the logistics of the forgery scheme. As the date of her deposition approached, Ms. Paul personally notified Habib on four different occasions that she was afraid of having to testify falsely under oath regarding the documents. According to Ms. Paul, Habib responded that she should not be nervous and that she could probably "outsmart them." Clearly, if Ms. Paul's testimony is credited, it serves as compelling evidence that the top Breezevale executives were complicit in the forgery scheme. The trial court, which observed Ms. Paul's testimony and also had heard testimony from the top three executives, credited this testimony, and its finding that the forgery was done with the knowledge of Awit and approval of Habib, is therefore not "plainly wrong or without evidence to support" it. *Jemison,* 720 A.2d at 281.

### B.

 Breezevale next argues that even if the evidentiary record as it stood before the trial court was sufficient, Breezevale was entitled to an additional hearing to present further evidence on the precise issue. A trial court's determination whether or not to conduct an evidentiary hearing is reviewed for abuse of discretion. *See Peddlers Square, Inc. v. Scheuermann,* 766 A.2d 551, 559 (D.C.2001) (finding no abuse of discretion where trial court denied a hearing on a motion for sanctions). We are satisfied that Breezevale was afforded a full opportunity to present its case both as to whether the documents were in fact forged and whether the top executives knew them to be so, and that it

was not an abuse of discretion for the trial court to deny Breezevale's request.

 Breezevale asserts that "due process principles" mandate it be afforded the requested hearing. Breezevale's position is not supported by our case law. Although a party "is entitled at least to a meaningful opportunity to argue, either in open court or on paper, against the imposition of any [ ] sanctions against him ... a full evidentiary hearing may not be necessary." *Brady v. Fireman's Fund Ins. Cos.,* 484 A.2d 566, 569 (D.C.1984). Thus, it was not error to deny Breezevale's request for a hearing, so long as Breezevale had sufficient opportunity to contest the underlying facts and to address the issue of sanctions.

Unquestionably, Breezevale had notice very early on that it was potentially subject to sanctions. GDC first raised its "counterclaim" alleging bad faith litigation in its answer to Breezevale's complaint. Breezevale's first opportunity to contest these claims occurred when it filed a "Motion To Dismiss The Bad Faith Litigation Counterclaim." The trial judge denied this motion in an order dated January 11, 1996 stating that "[t]here is no question that sanctions and attorneys' fees are appropriately imposed for improper trial tactics and bad faith litigation ...." (quoting *Zanville v. Garza,* 561 A.2d 1000, 1002 (D.C.1989)). Thus, it was apparent that the bad faith litigation claim would be a part of the case, and Breezevale had every reason to contest it during the ensuing seven-week trial.[7]

---

**7.** One colloquy involving both parties and the judge is particularly noteworthy:

> [GDC]: If I can clarify one more time for the record. We plan to argue, and we will be permitted to argue, that this is bad-faith litigation and fraud on the court in our opening statements to the jury.

> THE COURT: I don't know why you shouldn't be allowed to do that, since that is one of the underlying bases of your defense, that this lawsuit doesn't have a factual basis. That is your claim; isn't it?
> [GDC]: That is certainly one of them.

Breezevale contends that while it may have had an opportunity at trial to argue that the documents were not forgeries, it did not have any incentive to argue that the top Breezevale executives had a good faith belief that the documents were genuine. This position is puzzling. From the very beginning it was evident that the case involved questions not only whether the documents were forged, but also whether they were forged with the knowledge and participation of Breezevale executives. Indeed, the jury instructions required the jury to determine whether forgeries occurred and "if so, that one or more Breezevale executives participated in such forgeries." All three top executives in fact testified at length at trial. Evidence of its executives' good faith belief that the documents were genuine would tend to show not only that they did not participate in the forgery scheme, but cast doubt on the forgery issue itself by impeaching Ms. Paul's veracity. The proposition that there was no incentive at trial for Breezevale to argue that the top executives believed the documents to be genuine is dubious to say the least.[8]

Nor was Breezevale's opportunity to argue against the imposition of sanctions limited to the trial. At the conclusion of trial, Breezevale filed an 85–page brief titled "Plaintiff's Memorandum Of Points And Authorities In Opposition To Defendants' Motion For Dismissal And Other Sanctions." On remand, after issuance of this court's decisions in *Breezevale I* and *Breezevale II*, GDC filed a "Second Renewed Motion For Sanctions." Breezevale responded by filing a 48–page "Memorandum Of Points And Authorities In Opposition To Defendants' Second Renewed Motion For Sanctions." Included with this filing were sworn affidavits from top Breezevale executives describing the bases for their "good faith belief" that the documents were genuine. Thus, when the trial court issued sanctions against Breezevale, it had evidence of the good faith belief of the top executives before it, but was clearly unpersuaded.

In short, Breezevale had multiple opportunities over the course of proceedings which spanned more than seven years to present the trial court with evidence of the top executives' good faith belief and to argue the issue of sanctions. Furthermore, the sanctions were imposed by a judge who had participated in every aspect of the proceedings. *See Peddlers Square, Inc.*, 766 A.2d at 559. The decision whether to grant an evidentiary hearing is squarely within the trial court's discretion, *see id.*, and given the judge's extensive experience with the parties in this case, including hearing trial testimony by all the relevant parties, we conclude that it was not an abuse of discretion to deny Breezevale's request for a further evidentiary hearing on an issue that had been extensively litigated and thoroughly briefed.

### C.

Finally, Breezevale, rather remarkably, makes the strained assertion that the jury itself found that the documents were not forged, and therefore the trial court is "barred by the Seventh Amendment from revisiting the issue." Breezevale argues that the "Seventh Amendment demands that, if there is a view of the case which makes the jury's answers consistent, the

---

8. Breezevale argues that it did not present evidence of good faith belief at the trial because the trial court had "promised" a subsequent hearing on that issue. However, we can divine no such promise from the transcripts. In any event, Breezevale had every incentive to present this type of evidence in its post-trial motions. Notably, Breezevale did not invoke the trial court's so-called promise to hold a further evidentiary hearing in its 85–page brief opposing GDC's post-trial motion for sanctions.

court must adopt that view." Breezevale points to the jury's responses to questions # 3 and # 4, which indicate that although it believed forgeries occurred with the participation of one or more Breezevale executives, Breezevale's forgery of documents did not play a substantial part in damaging its lawsuit against Firestone.[9] According to Breezevale, the "consistent" view of the jury's answer is that the documents found to have been forged were not the offer letters and spreadsheets related to the lawsuit against Firestone, but rather other documents brought by Ms. Paul to her deposition, and that the "Breezevale executive" the jury found to have participated in the forgery was not either of Jaoude, Habib or Awit, but rather Ms. Paul herself.

Breezevale's reading of the jury's verdict simply does not withstand scrutiny against the backdrop of the actual litigation. The questions the jury was instructed to answer directly followed from the most intensely litigated issue of the case: whether the offer letters and spreadsheets were forged. It would strain reason to conclude that the jury interpreted question # 3 to relate to documents other than those at the heart of the malpractice claim. Likewise, there is nothing to suggest that the jury believed that Ms. Paul, whose testimony was that she was following the instructions of her superiors, was the Breezevale "executive" referred to in the question. To the contrary, the only logical interpretation of the jury's answer to question # 3 is that the offer letters and spreadsheets were forged (by Ms. Paul), and done so with the participation of at least one Breezevale executive (Jaoude).

Breezevale rests its argument on the court's instruction to the jury that in answering question # 4, the jury would "necessarily have to decide if [Ms.] Paul told the truth or lied when she testified that offer letters and spreadsheets dated 1987, were prepared in February 1991, with the knowledge and participation of one or more Breezevale executives." According to Breezevale, since the jury found that the outcome in fact would have been different, it must "necessarily" have also found that Ms. Paul lied. Breezevale neglects to consider the very next sentence of the court's instruction, however, in which it goes on to explain that the "answer to this question [whether Ms. Paul lied] *is a factor* you should consider as you determine whether Breezevale would have obtained more than the $100,000 settlement it ultimately reached with Firestone." Thus, the plausible reading of the jury's verdict is that although Ms. Paul told the truth about the forging of the offer letters and spreadsheets, Breezevale still had a strong enough claim that had her deposition been postponed, it could have successfully maintained its lawsuit against Firestone. *See Breezevale I*, 759 A.2d at 634 ("This jury knew of Breezevale's fraud and concluded that Breezevale nonetheless would have prevailed at trial. We do not think this conclusion was without any support."). The trial court was also cognizant of this likelihood: "[t]he irony is that Breezevale had a strong case for legal malpractice against GDC, regardless of how the forgery issue played out .... Postponing Ms. Paul's deposition would at least have bought time for GDC and Breezevale to

9. Specifically, the instructions read:
(3) Do you find that Gibson, Dunn, & Crutcher has established that forgeries occurred and, if so, that one or more Breezevale executives participated in such forgeries?
ANSWER: Yes

* * *

(4) Do you find that Gibson, Dunn, & Crutcher has established that Breezevale's forgery of documents played a substantial part in damaging its lawsuit against Firestone?
ANSWER: No

consider their options and develop a strategy for dealing with the problem." Accordingly, we conclude that the trial court's finding was not inconsistent with the jury's findings; rather, the findings were wholly consistent.

## III. Sanctions

Satisfied that there was sufficient support for the trial court's finding that Breezevale litigated its malpractice claim against GDC in bad faith, we now turn to the question of the sanctions imposed by the trial court. Breezevale raises certain arguments why each of the sanctions in itself was impermissible, as well as attacking the overall weight of the sanction. We address each argument in turn.[10]

### A.

■■■ Breezevale contends that the dismissal of its suit was an extreme and unwarranted sanction. Indeed, "[d]ismissal is an extreme sanction which should be granted only sparingly or in extraordinary circumstances." *District of Columbia v. Serafin*, 617 A.2d 516, 519 (D.C.1992). Nevertheless, we have recognized that dismissal is an appropriate sanction where a party "engage[s] in conduct utterly inconsistent with the orderly administration of justice." *Synanon Foundation, Inc. v. Bernstein*, 503 A.2d 1254, 1264 (D.C.1986) ("*Synanon I*") (quoting *Wyle v. R.J. Reynolds Industries, Inc.*, 709 F.2d 585, 589 (9th Cir.1983)). In *Synanon I*, the trial court found that a fraud upon the court was committed where there was evidence that Synanon executives had deleted,

burned and hidden incriminating information in the company's archives in an effort to avoid discovery of these materials. *See id.* at 1261. Based upon this finding of fraud, the trial court dismissed Synanon's complaint. *See id.* at 1262. On appeal, we affirmed, finding "ample evidence in the record to support [the trial court's] conclusion that the involvement of the Synanon executives and attorneys in the fraud, their subornation of perjury and their own false statements to [the trial court] constituted a fraud on the court, warranting dismissal of the complaint." *Id.*

■■■ We are satisfied that it was not impermissible for the court to dismiss Breezevale's complaint. "[C]ourts must be accorded considerable latitude in dealing with serious abuses of the judicial process and [ ] the trier's determination to dismiss a case for such a reason should be reviewed only for abuse of discretion." *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1117 (1st Cir.1989). Under the circumstances, the trial court had ample reason for concluding that dismissal was an appropriate sanction. As the judge explained,

It belabors the obvious to state that the entire Breezevale/GDC litigation, from first filings through discovery, motions practice, and trial was permeated by the forgery issue. The issue clearly interfered with "the judicial system's ability impartially to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of

---

**10.** As an initial matter, Breezevale, citing *Temple v. District of Columbia Rental Hous. Comm'n*, 536 A.2d 1024, 1031 (D.C.1987), argues that because of GDC's own alleged misconduct, GDC should be barred by the doctrine of "unclean hands" from recovering sanctions. The trial court rejected this argument as meritless in an order dated October 16, 1997. Breezevale did not raise this issue in its first appeal, and we have no cause to

revisit it here. *See Thoubboron v. Ford Motor Co.*, 809 A.2d 1204, 1215 (D.C.2002) ("[I]t is a general principle of appellate practice that where an argument could have been raised on an initial appeal, it is inappropriate to consider the argument on a second appeal following remand.") (quoting *Hartman v. Duffey*, 319 U.S.App.D.C. 169, 173, 88 F.3d 1232, 1236 (1996)).

the opposing party's claim or defense." GDC were forced to mount an enormous (but ultimately successful) attack on Breezevale's false claims of innocence; the jury had to sit through untold hours of complex testimony and argument to decide if Breezevale's documents were forged; and the trial judge then had to devote literally weeks of effort to comb through transcripts and records in order to address post-trial motions. For reasons Breezevale always knew but still refuses to acknowledge, the forgery issue should never have been made central to this case. By making it a major component of its malpractice suit against GDC, Breezevale perpetrated a fraud on the court which justifies dismissal of its action.

Breezevale's actions, as described by the trial court above, constitute "conduct utterly inconsistent with the orderly administration of justice," akin to that which we held warranted dismissal in *Synanon I. Id.* 503 A.2d at 1264. Accordingly, we affirm the trial court's imposition of this sanction.

### B.

█ Next, Breezevale takes issue with the trial court's award of attorneys' fees. Here, Breezevale does not argue that the trial court lacked authority to award any attorneys' fees, but rather asserts that the trial court erred in not limiting its award of fees to expenses related to Breezevale's bad faith litigation tactics. Breezevale relies upon *Synanon Foundation, Inc. v. Bernstein,* 517 A.2d 28 (D.C.1986) ("*Synanon II*"), in which we held that "in an action not in itself brought in bad faith, an award of attorneys' fees should be limited to those expenses reasonably incurred to meet the other party's groundless, bad faith procedural moves." *Id.* at 38–39 (quoting *Browning Debenture Holders' Committee v. DASA Corp.,* 560 F.2d 1078, 1089 (2d Cir.1977)). Citing *Breezevale I* and *II,* Breezevale contends that since its

suit against GDC did not lack substantive merit, the trial court could not have found that it *brought* the litigation in bad faith, but rather could only have found that it *litigated* the suit in bad faith. Since the award of attorneys' fees was not limited to those portions of the suit litigated in bad faith, Breezevale maintains the trial court erred.

In *Synanon II,* we recognized a distinction between suits *filed* in bad faith and suits *litigated* in bad faith:

[T]he conduct which would justify an award of bad faith attorneys' fees may be found either in the filing of a frivolous claim or in the manner in which a properly filed claim is subsequently litigated. . . .

The measure of the fee award differs depending on which is the case. . . . [W]here a suit has been filed in bad faith, the court has discretion to award the entire legal expenses incurred by the defendant. Conversely, "in an action not in itself brought in bad faith, an award of attorneys' fees should be limited to those expenses reasonably incurred to meet the other party's groundless, bad faith procedural moves."

517 A.2d at 38–39 (citation omitted). We went on to explain that the reason for this distinction is to prevent attorneys' fees from becoming a guise for the award of punitive damages. "If a bad faith litigant is compelled to compensate his or her opponent for legal expenses unrelated to the conduct warranting an attorneys' fee award, that award is not truly attorneys' fees at all but rather punitive damages under another name." *Id.* at 39.

While Breezevale's argument has merit as a general principle, we conclude under the circumstances of this case that the amount of attorneys' fees awarded by the trial court is sustainable. In *Synanon II,* we recognized that all attorneys' fees may

be awarded from the point bad faith litigation tactics commence, even though some of those expenses would still have been incurred absent the bad faith conduct. As we explained in *Synanon II*:

> Synanon officials and attorneys, starting within three months after the complaint was filed, sought to corrupt the administration of justice by systematically destroying materials they thought subject to discovery. Regardless of the relevance of these materials to the substantive legal issues in the case, the cynicism of this behavior cannot be entirely extricated from the pattern of fraud perpetrated upon the trial court by Synanon. Such conduct was enough to completely taint Synanon's entire litigation strategy from the date on which the abuse actually began. . . .

> The award of bad faith attorneys' fees for all of the defendants' reasonable litigation expenses was therefore proper from the point in October . . . when [Synanon] began destroying evidence . . . .

517 A.2d at 43. We think this rationale applies to Breezevale's actions. Here, Breezevale's bad faith litigation tactics commenced on the date of its first filing against GDC, when it alleged in its complaint that "[h]ad [GDC] conducted a competent and thorough investigation of [Ms. Paul's] allegations, they would have discovered that such allegations of wrongful conduct by Breezevale or its principal executives were untrue." As in *Synanon II*, this bad faith allegation "was enough to completely taint [Breezevale's] entire litigation strategy from the date on which the abuse actually began," i.e., the date the complaint was filed. Accordingly, GDC is entitled to the amount of attorneys' fees awarded by the trial court, despite the fact that Breezevale's claim had some substantive merit.[11]

### C.

■ Finally, Breezevale asserts that the trial court was without authority to impose punitive damages. According to Breezevale, the law in the District of Columbia is that there can be no award of punitive damages absent a basis for compensatory damages. However, we have held that "the award of attorneys' fees [is] itself compensatory," and "[i]n the context of bad faith litigation, repayment of the fees incurred in defending against the litigation is properly treated as compensatory damages." *Jemison*, 720 A.2d at 284. The trial court did not lack authority to impose punitive damages as a sanction for Breezevale's bad faith litigation. Second, Breezevale argues that the issue of punitive damages is for the jury, not the trial judge, to consider. This position is likewise irreconcilable with *Jemison*. In *Jemison*, we affirmed the trial court's imposition of punitive damages, holding that "[p]articularly when the activity in question contains the elements of a classic intentional tort, for which punitive damages are permissibly granted, we see no reason why a court may not award punitive damages." *Id.* at 285 (footnote omitted).

■ Nonetheless, we conclude that the separate award of $1 million in punitive damages should be vacated. The other sanctions imposed by the trial court themselves bore "punitive" elements. First, the dismissal of Breezevale's claim consequently vacated a jury verdict of $3,430,000. Second, the awarding of attorneys' fees is an exception to the traditional

---

11. Given the way this litigation progressed and was presented, the great bulk of attorneys' fees would appear to have been incurred in litigating the forgery issue. In any event, the portions of attorneys' fees otherwise directed can fairly be treated as permissible punitive damages, as discussed *infra* Part III. C.

"American rule," "the underlying rationale [of which exception] is, of course, punitive . . . ." *Hall v. Cole*, 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973). To the extent that at least some of the attorneys' fees awarded may not have been directly incurred as a result of Breezevale's bad faith litigation tactics, see Part III. B., the award of attorneys' fees in this case carries an added punitive element. Both of these sanctions, therefore, constitute significant punishment of Breezevale for its bad faith litigation tactics, and serve as an adequate deterrent to repetition of this behavior in the future. To impose an additional $1 million in punitive damages "lack[s] the reasonableness and proportionality required of a punitive damages award." *Daka, Inc. v. McCrae*, 839 A.2d 682, 697 (D.C.2003).

## IV. Conclusion

The use of known forged documents at the heart of civil litigation constitutes a serious threat to and abuse of the judicial process in fairly adjudicating private disputes. The trial court's dismissal of the suit and award of attorneys' fees and costs lay squarely within its sound discretion. We vacate only the separate award of punitive damages.[12]

*So ordered.*

---

12. The parties raise two additional arguments which can be resolved summarily. We affirm the trial court's denial of GDC's request for post-judgment interest on the monetary sanctions, concluding that attorneys' fees and expenses in the circumstances here do not fall within the provisions of D.C.Code § 15–109 (2001) ("Interest on judgment for damages on contract or tort"). We further conclude that it was not an abuse of discretion for the trial court not to reconsider its denial of Breezevale's motion for disgorgement of fees paid by Breezevale prior to GDC's alleged malpractice. *See Remsen Partners, Ltd. v. Stephen A. Goldberg Co.*, 755 A.2d 412, 416 (D.C.2000) ("There is no equitable reason for ordering disgorgement where plaintiffs have received the benefits they expected.").